### ANDERSON v. BOWRING & CO.

(District Court, N. D. California. August 18, 1911.)

1. SHIPPING (§ 49*)—CHARTERS—CONSTRUCTION—DELIVERY OF VESSEL.

Under a time charter party for a steamship providing that charter hire should commence "from the day on which she is delivered or placed at the disposal of the charterers at * * * or * * * in such dock or such safe wharf or place as charterers may direct," the vessel was delivered when, by direction of charterers' agent, she proceeded to one of the designated ports and as near as possible to a coaling wharf to await her turn to coal, and the charter hire then commenced, although she was obliged to wait several days for a berth.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 187–202; Dec. Dig. § 49.*]

2. SHIPPING (§ 49*)—TIME CHARTER—CONSTRUCTION—CHARTER HIRE.

A provision of a time charter party that "in the event of the loss of time from deficiency of men or stores, breakdown of machinery, collision, docking, stranding or other accident or damage preventing the working of the vessel for more than 24 consecutive hours, the time lost shall be allowed to the charterers," did not relieve the charterers from the payment of charter hire while the vessel was "docked" for receiving or discharging cargo or taking on bunker coals.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 187–202; Dec. Dig. § 49.*]

In Admiralty. Suit by C. Anderson against Bowring & Co., a corporation, to recover charter hire. Decree for libelant.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Wm. Loewy, Walter Loewy, and Andros & Hengstler, for libelant.
Frank & Mansfield and Nathan H. Frank, for respondent.

DIETRICH, District Judge. The libelant seeks to recover from the respondent $895, claimed to be due as a balance on account of the hire by the latter from the former of the steamship Germanicus for a trip to the west coast of South America. By the terms of the charter party the libelant was to receive, as hire, at the rate of £1,075 sterling per calendar month, and the only question is whether the respondent should be required to pay for the period intervening between June 15 and June 22, 1907. Two objections are urged to the claim: (1) That the vessel was not delivered to respondent until June 22d; and (2) that, if held to have been delivered upon June 15th, she could not be "docked" until June 22d, and therefore under the express provisions of the contract the time is to be excepted from the term for which hire became due.

[1] The first contention is based upon the following paragraph of the charter party:

"The hire to commence from the day on which she (the vessel) is delivered or placed at the disposal of the charterers (but not before June 1, 1907, if required) at Conrox or Nanaimo at charterers' option, in such dock or such safe wharf or place (where she may always safely lie afloat) as charterers may direct, she being then ready, with clear holds, tight, staunch, strong," etc.

It is not denied that upon June 15, 1907, the Germanicus was in every respect "ready" for delivery, and upon that day one Welcker, the charterers' agent, boarding her at Victoria, directed her captain to proceed to Departure Bay in Nanaimo Harbor. The order was complied with and the vessel entered the harbor upon the evening of the same day. The charterer proposed at once to take on bunker coals; but, upon learning that the coaling tip was crowded with other craft, Welcker ordered the captain to proceed as near as possible to the coaling wharf and there await his turn. Complying with these directions the Germanicus cast anchor as near the wharf as was safe to go and lay there until June 22d, when she moved into the berth assigned to her for taking on coal.

Upon behalf of respondent it is urged that, the charterer being empowered by the contract of hire to name the particular point of delivery, the term of hire did not commence to run until the owner delivered the vessel at the point selected, namely, the coaling wharf; and Anderson et al. v. J. J. Moore & Co., 179 Fed. 68, 102 C. C. A. 362 (C. C. A. 9th), is cited as being directly in point. The extent to which the contract there construed may, in the abstract, be differentiated from the one here relied upon, need not be determined, for the reason that it is thought that respondent's contention is ruled adversely by considerations arising out of facts peculiar to this case. If we assume that respondent had the right to designate the point of delivery, under the facts it must be held that its option was exercised when it directed the Germanicus to proceed to Nanaimo Harbor, to Departure Bay within the harbor, and to a specified point near the coaling tip within the bay. The uncontroverted testimony of Capt. Berndt is to

the effect that on June 15th, the vessel then being ready for delivery, Welcker directed him to anchor as close as possible to the coal tip, and that from that time on he acted under the orders of Welcker, who "also took care of the ship's business on arrival at Departure Bay, and had her entered at the custom house." It cannot be doubted that when the Germanicus cast anchor at the particular "place" in Nanaimo Harbor, where she was directed to go and ordered to remain by the charterers' agent, there was a "delivery" within the literal calls of the contract.

It is not pretended that the contract conferred upon the respondent any right or authority to control the vessel's movements prior to delivery, and it must be presumed that, when the agent practically took charge of her upon June 15th, he was acting under the belief that she was "delivered." To yield to respondent's contention would in effect be to hold that the charterer had the authority to go aboard the Germanicus upon her arrival at Victoria, direct her to go to a certain "place" in Nanaimo Harbor, and there remain at anchor, subject to its control and disposition, for an indefinite length of time, without assuming any responsibility or incurring any liability. It is true that at a later date Welcker served formal notice upon the owner of the acceptance of the vessel as of June 22d, but that fact is unimportant. The notice was in the nature of a self-serving declaration, and could not operate to recall a past event or vacate a delivery already consummated. If the charterer was unwilling to accept delivery at any place other than the coaling wharf, it should have so advised the owner before, not after, taking control of and holding the vessel at its disposal for a week. The owner was under no obligation to make delivery upon any specified date, and should have been left to dispose of his property as he saw fit until he could make delivery at the wharf. Under the record I cannot escape the conclusion that upon the evening of June 15th both parties were of the impression that, when the vessel cast anchor near the coal tip as directed by the charterer's agent, she was "delivered," and was thereafter at the disposal of the charterer. It is impossible to account for the conduct of the parties upon any other theory.

[2] Respondent's second contention rests upon the following provision of the charter party:

"That in the event of the loss of time from deficiency of men or stores, breakdown of machinery, collision, docking, stranding, or other accident or damages preventing the working of the vessel for more than twenty-four consecutive hours, the time lost shall be allowed to the charterers."

This language is found in the printed form used, and follows another printed paragraph (stricken out before the execution of the agreement) as follows:

"Steamer to dock and paint where and when required by charterers, but not more than once in every six months, at owner's expense, time so excepted not to be paid for by charterers."

The striking out of this latter paragraph operated to relieve the owner from the obligation to dock and paint the vessel, and nothing

more. By its elimination the meaning of the language above quoted from a subsequent paragraph of the contract is altered in no respect, and upon a fair construction of that paragraph, in the light of the entire contract, it is not thought that the word "docking" as therein used was intended to signify the process of receiving or discharging a cargo or of taking on bunker coals. It is quite plain, I think, that in employing the word provision was being made for loss of time in cases where it should become necessary to dry-dock the vessel for repairs or renovation. The "docking" referred to is that required to keep the vessel in "working" order, to enable the owner to perform his obligation to provide a serviceable craft. In that view the second defense, like the first, must be held to be without merit.

It follows that libelant is entitled to recover the amount prayed for, and it will be so ordered.