PYMAN S. S. CO., Limited, v. MEXICAN CENT. RY. CO.

(Circuit Court of Appeals, Second Circuit.   March 16, 1909.)

No. 200.

SHIPPING (§ 175*)—DEMURRAGE—CONSTRUCTION OF CHARTER PARTY—LOADING.
    Under a charter party providing for the payment of demurrage by the charterer for delay in loading or discharging beyond the lay days specified, "except in case of strikes or any other accidents or causes beyond the control of the charterer," the charterer is not liable for delay in loading caused by the refusal of the owner of the coal dock at which the vessel was directed to load, and which was the only one at which the charterer could reasonably load, to give her proper dispatch, which was a cause "beyond the control of the charterer," within the meaning of the exception.
    [Ed. Note.—For other cases, see Shipping, Cent. Dig. § 572; Dec. Dig. § 175.*
    Demurrage, see notes to Harrison v. Smith, 14 C. C. A. 657; Randall v. Sprague, 21 C. C. A. 337; Hagerman v. Norton, 46 C. C. A. 4.]

————————————————————

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Appeal from the District Court of the United States for the Southern District of New York.

This cause comes here upon appeal from a decree awarding to the libelant, the owner of the steamship Dunholme, demurrage by reason of her detention in the port of Philadelphia from December 24, 1906, to January 4, 1907. The opinion of the District Judge will be found in 164 Fed. 441.

Frederick R. Swift (George L. Kobbe and Joseph H. Choate, Jr., of counsel), for appellant.

J. Parker Kirlin and Russell T. Mount, for appellee.

Before LACOMBE, COXE, and WARD, Circuit Judges.

LACOMBE, Circuit Judge. The relevant clauses of the charter party are as follows:

"* * * That the said steamer * * * shall * * * proceed to the port of Philadelphia and after discharge of her inward cargo there load in the customary manner from the agents of the freighters, at such dock or wharf as she may be ordered to by charterers' agents on arrival, full and complete cargo, consisting of about 5,000 tons of coal. * * *

"It is agreed that the days for loading and discharging shall be as follows: Commencing at 6 o'clock a. m. on the day after vessel reports and is ready to receive or discharge cargo. Cargo to be loaded at customary dispatch. * * *

"Demurrage, if incurred, to be paid by the charterers or their agents at the rate of 10 cents United States currency per net registered ton per day (except in case of strikes or any other accidents or causes beyond the control of the charterers which may prevent or delay the loading and or discharging). Detention by frost or quarantine not to be reckoned in lay days."

Several points have been discussed in the briefs, but it will be necessary for us only to consider the exception in the last of the above-quoted paragraphs.

The findings of the District Judge, which are here summarized, are supported by the testimony and sufficiently set forth the facts. After arrival at the port of Philadelphia the vessel discharged, put herself in condition to receive cargo, and gave written notice of the fact. The cargo provided was ready at the piers of the Pennsylvania Railroad Company at Greenwich Point, in that port. In Philadelphia coal as cargo is never loaded in any other way than through chutes, from which coal contained in railroad cars is dumped directly into the holds of vessels. There are only three places at which coal in cargo quantities can be thus loaded. These are the piers of the Pennsylvania Railroad at Greenwich Point, those of the Baltimore & Ohio Railroad Company at Jackson street, and those of the Philadelphia & Reading Company at Port Richmond. Vessels of the size of the Dunholme cannot be loaded at the Baltimore & Ohio piers at Jackson street, and there are but four berths at which she could be loaded at Greenwich, and but one at Port Richmond. These various piers were entirely under the control of the railroad companies, which owned them, and no shipper had any power to control the order in which vessels should be admitted to them, nor to procure a berth for any vessels, except as the owners of the piers might permit. Before the steamer finished discharging, charterer's agent communicated with the officer in charge

of the Pennsylvania Railroad piers, who had the power to determine the order in which vessels should receive their berths, notifying him that the Dunholme would require a berth on or about December 17th. Thereafter he made repeated and persistent applications to the proper officers of the railroad to secure a berth, and, as the District Court finds, "respondent did all it could to expedite the loading."

It was suggested on the argument that the coal provided for her cargo might have been sent through the city by rail from Greenwich Point to Port Richmond; but the evidence indicates that it was not within the power of the shipper to compel the connecting railroads so to convey. The vessel was delayed two weeks by the arbitrary action of the Pennsylvania Railroad, which, instead of giving her proper dispatch, postponed her admission to a berth until after other vessels, which came later, but which happened to belong to shippers whom the railroad favored, had been admitted and loaded. The cause of this delay in loading was evidently "beyond the control of the charterers," in the ordinary use of that phrase, and we are not persuaded to the conclusion that it means anything else because it is included in the same sentence with "strikes or any other accidents." She was deprived of her turn because a third person, who controlled the situation, refused to let her have it, and such deprivation was the proximate cause of the delay.

The decree is reversed, with costs of this appeal, and cause remanded, with instructions to decree in conformity with this opinion.