STEAMSHIP RUTHERGLEN CO., Limited, v. HOWARD HOULDER & PARTNERS, Inc.

(Circuit Court of Appeals, Second Circuit. February 10, 1913.)

Nos. 130, 131.

1. SHIPPING (§ 58*)—CHARTERS—GUARANTY OF CARGO CAPACITY—DAMAGES FOR BREACH.

Where a vessel chartered for a voyage for a lump sum to carry a cargo of railroad rails proved to have less capacity than was guaranteed by the charter, the charterers, who tendered the full cargo, are entitled to recover as damages the difference between what they would have paid under the charter for the carriage of the cargo shut out and what they would have received from the cargo owner under its bill of lading, if it had been carried.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 233–244, 314, 327; Dec. Dig. § 58.*]

2. SHIPPING (§ 39*)—CHARTERS—CESSER CLAUSE.

The cesser clause in a charter party, that "charterer's liability to cease on cargo being shipped and freight paid," where the freight is paid on loading, relieves the charterer from liability for the acts or omissions of others at the port of discharge, but not from liability for failure to perform his own engagements under the charter.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 141–148; Dec. Dig. § 39.*]

3. SHIPPING (§ 47*)—CHARTERS—CONSTRUCTION—TIME AND PLACE FOR DISCHARGING.

Where a charter party does not provide for lay days for discharging, the charterer is required to discharge with reasonable diligence; and what constitutes such diligence depends on the circumstances of the case, among others, the character, condition, and customs of the port. Where it is not provided that the vessel shall go to a berth as ordered, the charterer has the right to name the discharging place; but, if he does not do so within a reasonable time, the master may choose one for himself.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 182, 183; Dec. Dig. § 47.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

**4.** SHIPPING (§ 177*)—DEMURRAGE—CONSTRUCTION OF CHARTER.

A charter party did not provide the lay days for discharging, but that "the cargo be discharged [by the charterer] with all possible speed according to the custom of the port of discharge," and that "any time lost in * * * discharging through riots, fire, * * * or any causes beyond the personal control of the said charterers not to be computed as part of the said lay days." It further provided, "Charterers to provide lighters, if necessary, to enable steamer to go alongside any safe dock, wharf, or anchorage, as ordered, where steamer shall discharge always afloat," and also authorized the owners to use lighters at the risk of the cargo owner. At the port of discharge there were berths where the steamer with her cargo could safely lie afloat; but when she arrived all such berths were occupied, and it was several days before she could get one, when she was discharged with all due speed. *Held*, that the charterer was not bound to lighter her until she could reach one of the berths which were open, and was not liable for demurrage for the time she was delayed in reaching the berth designated.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 576–582, 584; Dec. Dig. § 177.*

Demurrage, see note to Harrison v. Smith, 14 C. C. A. 657; Randall v. Sprague, 21 C. C. A. 337; Hagerman v. Norton, 46 C. C. A. 4.]

**5.** SHIPPING (§ 39*)—CHARTERS—AGENCY FEES.

A provision of a charter party that the steamer should be consigned to charterers' agents at port of loading and discharge "on usual terms, say £10.10 at each port," did not bind the steamer to employ such agent, if he refused to act for the fixed charge or the usual charge; and where, in such case, he was employed and paid a larger sum than that named, the owner is entitled to recover from the charterer the excess paid over the usual charge only, the sum named being merely an estimate of such charge.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 141–148; Dec. Dig. § 39.*]

Appeal from the District Court of the United States for the Southern District of New York; George C. Holt, Judge.

Suit in admiralty by the Steamship Rutherglen Company, Limited, against Howard Houlder & Partners, Incorporated, with cross-libel. Decree for libelant, and respondent appeals. Reversed.

For opinion below, see 196 Fed. 916.

Haight, Sandford & Smith, of New York City (J. W. Griffin and C. S. Haight, both of New York City, of counsel), for Howard Houlder & Partners, Inc.

Convers & Kirlin, of New York City (J. M. Woolsey and J. Parker Kirlin, both of New York City, of counsel), for Steamship Rutherglen Co., Limited.

. Before LACOMBE, WARD, and NOYES, Circuit Judges.

WARD, Circuit Judge. The owners of the British steamer Rutherglen chartered her to Howard Houlder & Partners for a voyage from New York to Dalny and Takow, Formosa, with a cargo of railway material which has been duly delivered. Various disputes have arisen between the parties which are now to be disposed of.

[1] 1. The owners filed a libel to recover an unpaid balance of charter hire. The charter called for a lump sum hire of £9,400 to

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

be paid before sailing. The charterers paid only £9,122.12.6, claiming that the vessel fell short of the dead weight capacity guaranteed by the owners to the extent of 219.3 tons. The charterers filed a cross-libel to recover the freight engaged for the cargo shut out by this breach of guaranty.

The District Judge found that the vessel did fall short of the guaranty as claimed by the charterers, and that the bill of lading freight coming to them for cargo shut out would be, if it had been carried, £397.11.6. He allowed to the charterers the difference between the charter hire and the bill of lading freight, to wit, £120.3.11. The owners claim that the charterers are only entitled to the difference between the unpaid charter hire, £277.7.7, and £120.3.11, the profit on the bill of lading freight. This would result in the charterers being liable to the owners on this account for the sum of £157.3.8.

We think the District Judge was right. If the vessel had conformed to the guaranty the charterers would owe £277.7.7. Because it did not, they have lost £397.11.6. Setting one claim off against the other, the difference is against the owners and in favor of the charterers, £120.3.11.

The court below entered a decree in each action, the effect of which is precisely the same as if the better practice of entering one decree as in case of bill and cross-bill in equity had been followed. The contention of the owners is manifestly wrong, because it makes the charterers pay £157.3.8 for cargo space they never received, and this for the singular reason that they had sustained an additional loss of £120.3.11. In other words, if they had not engaged at a profit the cargo shut out, they would have been better off, because they would have been allowed £277.7.7 for the cargo capacity short, instead of £157.3.8.

2. The owners claim 15½ days' demurrage at Dalny, and the District Judge allowed it. The provisions as to demurrage are as follows:

"Fifteen (15) running days, Sundays and holidays excepted, to be allowed charterers for loading steamer and the cargo to be discharged with all possible speed, according to the custom of the port of discharge. Vessel to receive cargo on clearing day if required, free of demurrage. Demurrage over and above the said lay days to be paid at the rate of four pence per net register ton per day for each and every day the steamer is detained at port of loading by the default of the charterers."

The steamer arrived December 17th, was free of pratique on the morning of December 18th, and on that day served notice of readiness to discharge upon the charterers' agents. She did not get into her berth until January 2d, nor begin discharging until January 3d. The District Judge allowed demurrage at the rate of four pence per net registered ton for every day from December 19th to January 3d.

[2] The charterers contend that they were relieved of liability for anything occurring at Dalny by virtue of the cesser clause, which reads:

"Charterers' liability to cease on cargo being shipped and freight paid."

The freight was paid at New York on the shipment of the cargo, and the owners make no claim for demurrage or anything else occur-

ring there. The clause would protect the charterers from liability for anything done at the discharging port by others, but not for anything which they had themselves agreed to do. The charter contemplates that the charterers will receive the cargo at Dalny. It provides that in certain circumstances they will be obliged to provide lighters, and that for delay in discharging, due to certain excepted causes, they are not to be liable, and that the vessel is to be consigned to their agents. Accordingly the cesser clause does not protect them from liability for delay incurred in discharging at Dalny not within the exceptions.

[3] There is a wilderness of law upon the subject of demurrage. The decisions depend upon the language of the various charters and are difficult to reconcile. Mr. Carver has laid down six propositions in his work on Carriage by Sea (section 623), which have been approved in the case of Leonis S. S. Co. v. Rank, 1 K. B. (1908) 499. We need not consider them, because they are confined to charters which provide for a fixed number of lay days within which a charterer is bound to load or unload, and which generally, as in the case of the Leonis Company, define precisely when the lay days shall begin to run. Notwithstanding these propositions, it is the law in England that, where no lay days are provided for, the charterer is only required to load and receive cargo with reasonable diligence. Carver, Carriage by Sea, § 628; Hulthen v. C. A. Stewart & Co. [1903] A. C. 389; Id., 8 Com. Cas. 297. What constitutes reasonable diligence will depend upon all the circumstances of the case; among others, the character, condition, and customs of the port of loading and discharging. In such a case, where no place of loading is specified, nor any agreement that the vessel shall go to a berth as ordered, the charterer has the right to name the loading or discharging place; but, if he does not do so within a reasonable time, the master may choose one for himself.

[4] In the present case the charter did provide lay days for loading, the rate payable for demurrage, and that the vessel should load at a berth or berths as ordered by the charterers. In respect to discharging, however, it only provided that "the cargo be discharged with all possible speed according to the custom of the port of discharge," and that any time lost in discharging for certain excepted causes, should not be chargeable to the charterers. The owners admit that, after the discharge began, the cargo was received without delay. When the steamer arrived at Dalny, all berths where she could lie afloat were occupied or congested with freight, and neither the charterers' agents nor the master of the steamer were able to get a berth for her sooner. In such circumstances we do not think that the charterers can be said to be chargeable with any lack of reasonable diligence in discharging.

The District Judge, however, held that the charterers were bound to employ lighters to take off enough cargo to enable the vessel to lie afloat safely at one of the unoccupied berths, where there was not water enough for her when fully loaded. It was his opinion that they could have obtained such lighters, but, even if they could not, that

they were liable for not enabling the steamer to go to such a berth, and so saving time in discharging. He rested his conclusion upon the parenthetical clause, supra:

"(Charterers to provide lighters, if necessary, to enable steamer to go alongside any safe dock, wharf, or anchorage as ordered where steamer shall discharge always afloat.)"

If we are to construe this clause as requiring the vessel to go to any wharf as ordered by the charterers, then clearly no claim for demurrage could arise until she had arrived alongside the wharf as ordered by them. But the clause in our opinion gives the charterers the privilege of requiring the vessel, if lightened, to go to a wharf where she could not lie afloat with all cargo aboard. They are not obliged to order her to such a berth. It is to be noted that the bill of lading gives the owners the same privilege. By it they are entitled "to convey goods in craft and/or lighters to and from the steamer at the risk of the owners of the goods." Neither party can be said to have been at fault for not exercising this privilege.

The owners contend that the charterers are liable for demurrage at Dalny, because the cargo was not discharged with "all possible speed according to the custom of the port," as required by the charter. They treat the clause as containing two separate propositions, viz.: "All possible speed," in respect to the time in which the vessel shall be discharged; and "according to the custom of the port," in respect to the method of discharging after it has begun. Whether this is what these clauses mean when used separately need not be considered, because we think that in the clause as it reads the custom of the port applies both to the time and to the method of discharging. There was, to say the least, no proof showing that the cargo was not discharged according to the custom there prevailing either in respect to the time or the method of discharging.

Finally, we think that, if there was delay in discharging at Dalny, the charterers are relieved from liability therefor by the exceptions contained in the charter party, viz.:

"Any time lost in loading and/or discharging through riots, fire, frosts, floods, storms, strikes, lock-outs, accidents to mills or machinery, or any causes beyond the personal control of the said charterers not to be computed as part of the said lay-days."

The last words cover an independent category of causes not subject to the doctrine of ejusdem generis. It is quite clear that the vessel got the first vacant berth where she could lie afloat as loaded in accordance with the practice prevailing at Dalny. Pyman S. S. Co. v. Mexican Cent. R. Co., 169 Fed. 281, 94 C. C. A. 557; Leonis S. S. Co. v. Rank, No. 2, 13 Com. Cas., 161.

[5] 3. The last claim in the owners' libel was for $70.56, being excess of attendance fee over £10.10 paid by them to the charterers' agents at Takow. The charter party provided "steamer to be consigned to charterers' agents at port of loading and discharge on usual terms, say £10.10 at each port." It is a printed form of the agents for owners. If they had intended to fix a sum beyond which the owners

were not to be liable to the charterers' agents, they could easily have stated it. Or they could have stipulated to pay only the usual charge without saying more. When charterers under such a clause name no agents, the owners may employ whom they will. If the agents named refuse to act for the fixed charge, or for the usual charge, the owners are not bound to employ them. In this case the charter party bound the owners to pay only the usual charge estimated at £10.10. The agent named by the charterers refused to act for less than £25, which the owners paid. They are entitled to recover from the charterers any amount paid above the usual charge, and, there being no proof as to what the usual charge is, nothing should have been allowed them.

The decree in favor of the libelants is reversed, and that in favor of the cross-libelants set aside. The court below is directed, instead of two decrees, to enter a single decree dismissing the libel, with costs, and awarding the cross-libelants $584.93, with interest from October 18, 1907, and the costs of both courts.