DICK CHIARELLO & BROS., Inc., v. CENTRAL R. CO. OF NEW JERSEY et al.

(District Court, S. D. New York. April 9, 1917.)

1. SHIPPING ⊆⇒177—DEMURRAGE—DISCHARGING BY LIGHTER.
    Where a vessel required to discharge her cargo at a dock employs lighters for the purpose, the consignee is not liable for damages in the nature of demurrage, if the lighters are discharged within the time allowed if the vessel had discharged directly.

2. SHIPPING ⊆⇒183—DEMURRAGE—LIGHTERAGE.
    The rules of the Maritime Exchange, Harbor of New York No. 4, regulating rates of demurrage in case of lighters, does not measure damages in the nature of demurrage, where there is no contractual relation between the parties and such damage must be proved.

In Admiralty. Suit by Dick Chiarello & Bros., Incorporated, against the Central Railroad Company of New Jersey and the Philadelphia & Reading Railway Company. Decree for respondents.

Nelson Zabriskie, of New York City, for libelant.
Henry L. deForest, of New York City, for respondent Central R. Co. of New Jersey.
William F. Purdy, of New York City, for respondent Philadelphia & R. Ry. Co.

MAYER, District Judge. In addition to necessary formal allegations, the libel sets forth: That libelant was the owner and charterer of certain lighters. That at various times during 1913 there were shipped from certain steamships then lying in the port of New York, on libelant's lighters, certain cargoes of railroad ties consigned to the Port Reading Creosote Plant at Port Reading, N. J.; these cargoes being the property of respondent the Central Railroad Company of

New Jersey. That libelant transported said cargoes of ties on its lighters under bills of lading or shipping documents, each of which contained a clause entitled "Rules Regulating Deliveries," which set forth the rate per day at which lumber was to be received from the lighters, and that "lighters reporting before 1 p. m. on any one day, their time to begin at 7 p. m. following morning. Lighters operating to 1 p. m., time to be combined from 1 p. m. following day * * * on lighters over 100 M. feet B. M. $20 per day. * * *" That, owing to the fault and neglect of respondents, libelant's lighters reported and were discharged on various later days set forth in a schedule, and that the cargoes were received by respondents under the above-mentioned bills of lading or shipping documents. That the fair, customary, and agreed time for discharging said cargoes was the reporting day and the additional lay days as set forth by libelant in a schedule, and that the number of days demurrage was also set forth in the schedule, the rates for which amounted in all to $1,260 beside interest. The libel then contains the following paragraph:

"Ninth. That each of said vessels of your libelant was, through the negligence, fault and delay of both of the respondents above named, detained after the discharge of their cargoes, over and above the said fair, reasonable, usual and agreed time, the number of days set opposite the name of each of said vessels, as stated in said Schedule A, and that the fair, reasonable and agreed sum for the use, hire or detention of each of said vessels was the sum of $20 per day, or as above stated $1,260 in all."

And the libel concludes with the allegation that there is owing to libelant by respondents as damages for detention the sum of $1,260 besides interest, payment of which was duly demanded and refused.

The libel is drawn on the theory that the action is one for strict demurrage arising out of a contract between the parties. The proof shows that there was no support for this theory of the libel, and that the action, if any, was for damages in the nature of demurrage.

The distinction between these two kinds of causes of action was clearly set forth in Dayton v. Parke, 142 N. Y. 391, 37 N. E. 642, and recently has been fully and carefully pointed out by Judge Rogers in Ben Franklin Transportation Co. v. Federal Sugar Refining Co. (C. C. A. 2d Cir.), 242 Fed. 43, —— C. C. A. ——.

The libel must be amended to conform with the proof, and, as all the evidence has been taken and respondents have not been subjected to surprise, and agreeably with the liberal practice in admiralty in such regard, it will save time and convenience to let the record note that the libel may be amended to conform with the proof.

[1] The facts hereinafter set forth are quite different in essential respects from those set forth in the libel. The two respondents maintain a creosoting plant at Port Reading as a joint operation. Each company buys ties, and Taylor, the superintendent of the plant, creosotes these ties and charges each company with its proper proportion of the expense of so doing. It is conceded that, in dealing with the lighters from the Iroquois and Mills, Taylor represented the Central Railroad Company of New Jersey, while in dealing with the lighters from the Shawmut he was representing the Philadelphia & Reading Railway Company.

There were three contracts for lumber with three vendors; two by the Central Railroad Company of New Jersey and one by Philadelphia & Reading Railway Company. They were similar in form, and that between Philadelphia & Reading Railway Company and Gress Manufacturing Company may be taken as typical. The essential features of the contract are as follows:

"We hereby agree to deliver to P. & R. Ry. Co. f. o. b. their wharf Port Reading, New Jersey, 25000 Sap Pine cross-ties in accordance with attached specifications and Purchasing Agent's Order No. 53. * * *

"Deliveries to be made between now and Jany 1, 1914.

"[Signed] Gress Mfg. Co. * * *

"Note.—When filled out send to J. D. Landis, Purchasing Agent, Reading Terminal, Philadelphia."

The essential provisions of order No. 53, addressed by the railway company to Gress Manufacturing Company, were:

"Please deliver to this company, according to specifications and subject to our inspection, f. o. b. our wharf Port Reading, N. J. 25000 Sap Pine cross-ties. * * * Consign to the Philada. & Reading Railway Company c/o C. Marshall Taylor, Supt. Creosoting Plant Port Reading, N. J."

The ties were shipped on the steamers Iroquois, Mills, and Shawmut. No bill of lading of the Iroquois reached the Central Railroad. In the bill of lading of the Mills there is no reference whatever to demurrage. In the bill of lading of the Shawmut (Southern Steamship Company) section 5 of the "Conditions" provided, inter alia:

"The carrier may make a reasonable charge for the detention of any vessel * * * for loading or unloading."

There was no provision in the bills of lading, or in any agreement between the shippers and the respondent railroads, for the transfer of the ties from the steamers to lighters and the subsequent discharge by lighters of these cargoes of ties. The Iroquois and the Shawmut docked at their piers in New York, and the ties were shipped to the railroad at Port Reading on libelant's lighters. In the case of the Iroquois, the lighter Seven Brothers No. 9 arrived at Port Reading on Thursday, January 9th, at 3:30 p. m., commenced discharging Monday, January 13th, at 1 p. m., and was finished on January 17th, at 10:30 p. m. Her captain, from recollection, testified that one of libelant's other lighters arrived after and unloaded before him. This is contradicted by Taylor, the superintendent, and Meisner, the pier foreman from his records. I accept the testimony of respondents' witnesses on this point as being more reliable than the unsupported recollection of the captain of the lighter.

In the case of the Shawmut, five lighters arrived at Port Reading. At Port Reading there is a dock with four slips, and an unloading hoist and platform where inspection is made is located about in the center of each slip. There are 26 feet of water in one slip and 22 feet at the other three. A berth was accorded these lighters, and the lighters discharged in turn at this berth, except that a second berth was available during the progress of discharging, so that one of these lighters, San Salvador, commenced unloading while another, the Vincent, was still discharging.

It will be remembered that the provision in the Shawmut bill of lading as to detention related solely to the "vessel," and did not mention lighters. Taylor showed that these five lighters were handled within the time allowable under the rules (infra) of the Maritime Exchange if the Shawmut herself had gone to Port Reading.

In the case of the Mills, the vessel herself reported at Port Reading June 24th at 3 p. m., and commenced discharging onto the pier by her own tackles one hour later. She remained for three days, having discharged several thousand ties on the dock; but, when she left, there were five lighters remaining to be unloaded, the main part of the cargo evidently having been discharged by the Mills over the other side to lighters.

The Mills lighters received the same kind of treatment as those from the Shawmut, and in this case also a second berth was apparently available during the progress of discharging, for the lighters Leo R. and Sallie C. both commenced to unload at about the same time on July 7th. In this instance, also, Taylor showed that the lighters were discharged well within the time allowable under the Maritime Exchange rules if the Mills had continued to discharge at Port Reading. Various receipts were mailed by libelant to Taylor in a letter asking that they be signed as a receipt for the cargoes, and at the bottom of these receipts are printed the rates of demurrage charges (being the "Rules Regulating Deliveries" referred to in the libel); but, both from the correspondence and the testimony of the witness Chiarello, it appears that the papers were receipts only, and not notice of a claim for demurrage, nor, indeed, could this printed matter be any evidence of any agreement for or assent to the payment of demurrage charges.

Respondents had nothing whatever to do with the hiring of the lighters, and there is no evidence that the shippers hired the lighters, and, indeed, the only evidence on the subject is that, in the case of one of the steamers, the lighter was hired by the steamer people.

There is some evidence that at the times in question it was customary to discharge cargoes of this character by lighters, but no evidence that there was an established universal and uniform custom at the port requiring consignees to do more than assign a berth to the lighters discharging the cargo ex a vessel in the manner done in this case. Indeed, Landis, the purchasing agent of respondents, showed, beyond question, that he had had dealings with the shippers for years, that they knew the facilities at Port Reading, and that about 25,000 ties constituted a schooner load; and Taylor testified that the then custom at Port Reading was to take cargoes arriving in their order, that these cargoes arriving on five lighters were treated as if they had arrived on one schooner, except when he happened to have an extra berth.

From the foregoing it will appear that the sole duty resting on respondents was to furnish a berth where the lumber company in each instance could place the ties for inspection with reasonable diligence, in accordance with the custom of Port Reading at that time, and this, on the evidence, was done. There was at most only the obligation on the part of respondents to treat the lighters the same as if they represented the vessel.

Libelant, unable to find any contractual relation between itself and respondents, contends, however, that respondents are liable because the lighters were detained:

First, over and above the customary and usual time for discharging like cargoes from lighters in and about the harbor of New York.

Second, over and above the time allowed for discharging like cargoes in and about the harbor of New York as established by the rules of the Maritime Exchange, which rules reflect or are in accordance with the custom.

Third, over and above the time fixed for discharging by the rules or tariff rates established by the Clyde & Mallory Lines and filed with the Interstate Commerce Commission.

As to contention third: The tariff is irrelevant because the Iroquois and Mills were not common carriers, and the ties on the Shawmut were moved on a port to port movement and are not subject to the Interstate Commerce Act.

As to contention first: There was no agreement to deliver by lighters, and at best demurrage or damages in the nature of demurrage, if any, would be that accruing for the undue detention, if any, of the lighters beyond a period equivalent to that necessary to discharge the vessels on which the ties were shipped.

[2] As to contention second: The rules of the Maritime Exchange referred to by libelant which cover a territory comprehensive of "Port Reading" are as follows:

"Rules Regulating Delivery and Receipt of Railroad Cross-Ties.

---

"Rule I.

"Regulating the Delivery of Railroad Ties.

"Consignees shall have twenty-four hours (Sundays and legal holidays excepted) after the vessel arrives, and the master or the vessel's agent reports, in which to furnish the vessel with a berth where she can discharge.

"At the expiration of said twenty-four hours, vessel's lay day shall commence; except that, in case consignees have given orders within the allotted time, and vessel fails to report at berth before noon, her lay days shall not begin until the morning following.

"Lay days allowed consignee for receiving cargo shall be as follows. viz.:

"Twenty-four hours to furnish a berth as provided in above rule, and one running day (Sundays and legal holidays excepted), for every fifty thousand (50,000) feet board measure of the ties."

"Rules Regulating Lighterage.

"Rule IV.

"Demurrage at the rate of ten dollars per day may be charged on parcels of merchandise of fifty tons and under on any one lighter and barge; fifteen dollars per day on parcels of over fifty tons and not exceeding one hundred tons, and twenty dollars per day on parcels of over one hundred tons."

Rule 1 refers to vessels. It does not subject the consignee to damages in the nature of demurrage in the absence of contract, if delivery is by lighters. Rule 6, regulating "Southern Pine Cargoes," if it were applicable, gives the consignee the right to receive the cargo in lighters.

Rule 4 obviously regulates the rate of demurrage, but cannot measure damages in the nature of demurrage. Such damages must be prov-

ed like any other damages, and, on the evidence, in this case, even if libelant were entitled to recover, no damage has been proved. Dayton v. Parke, supra.

Many cases have been cited such, for instance, as those where it is provided that the vessel shall be discharged "with customary dispatch" and the local custom is read into the contract. This proposition is, of course, elementary, but is foreign to this case. Taking the view most favorable to libelant, the duty, if any, from respondents to libelant, was fully performed in accordance with the principle of cases like Leonard v. William G. Barker Co. (D. C.) 214 Fed. 325; Fish v. 150 Tons of Brown Stone (D. C.) 20 Fed. 201; Steamship Rutherglen Co., Ltd., v. Howard Houlder & Partners, Inc., 203 Fed. 848, 122 C. C. A. 166.

The libel is dismissed, with costs.