**ORIENT SHIPPING ROTTERDAM B.V., Plaintiff,**

v.

**HUGO NEU & SONS, INC., Defendant.**

**No. 92 Civ. 8585 (CSH).**

United States District Court,
S.D. New York.

March 20, 1996.

Walker & Corsa, (Richard A. Corwin, R. Brett Kelly, of counsel), New York City, for Plaintiff.

Curtis, Mallet–Prevost, Colt & Mosley (Herbert M. Lord, Elizabeth L. McDougall–Tural, of counsel), New York City, for Defendant.

### MEMORANDUM OPINION AND ORDER

HAIGHT, Senior District Judge:

Plaintiff Orient Shipping Rotterdam B.V., the disponent owner of the motor vessel Mastrogiorgis B, chartered her to defendant Hugo Neu & Sons, Inc. for a voyage from New York to Bombay, India, with a cargo of shredded scrap metal. The voyage having been completed, plaintiff sues for demurrage incurred at the discharging port. Defendant denies liability for demurrage and counterclaims for despatch.

Unlike most modern charterparties, this one did not contain an arbitration clause. The action, which falls within the admiralty and maritime jurisdiction, was tried to the Court. The following opinion constitutes the Court's findings of fact and conclusions of law pursuant to Rule 52(a), Fed.R.Civ.P.

### I

The charterparty between plaintiff and defendant, dated June 19, 1992, called for the Mastrogiorgis B to load a full cargo of shredded scrap at New York and then proceed to one safe berth in Bombay.

The charterparty provided in clause 18:

Cargo is to be loaded, stowed, trimmed at the average rate of 10000 MT per weather working days of 24 consecutive hours, Saturdays after noon, Sundays and holidays excepted, even if used.

Cargo is to be discharged at the average rate of 1500 MT per weather working day of 24 consecutive hours, Saturdays, Sundays and holidays excepted, even if used. Laytime is reversible.

The vessel loaded 21,262.8 metric tons of cargo at New York. She departed that port on June 25, 1992. On August 9, 1992, the vessel arrived at the port of Bombay.

The master tendered notice of readiness at 11:00 a.m. on August 9, which defendant's Bombay agent accepted on August 10. Upon arrival at the port, the Mastrogiorgis B anchored at the Bombay Floating Light. On August 21 the vessel shifted from the Bombay Floating Light to the anchorage. She was free of pratique on August 21. The vessel remained at the anchorage until August 25 when the port authorities ordered her to shift back to the Bombay floating light. The vessel did not berth until September 10, 1992, when discharging began.

The delay the Mastrogiorgis B encountered in berthing at Bombay resulted from port congestion. During the months of July and August, 1992, a total of eleven vessels with scrap cargoes arrived at the port. Seven scrap vessels arrived between July 13 and August 15. When the Mastrogiorgis B arrived at Bombay on August 9, there were three scrap vessels in berth and three earlier arriving vessels awaiting berth.

The Mastrogiorgis B was berthed in turn. Plaintiff does not contend otherwise.

Shredded scrap is a "direct delivery cargo" at Bombay. Discharge of such cargo is made directly from vessels into trucks for transportation inland. Scrap is not placed and stored on the pier. The trucks are obtained by the cargo receivers. The defendant at bar was the charterer of the vessel. It was not the receiver of the vessel's cargo. That was a third party.

The port authorities at Bombay control the use made of the various berths. Normally only two berths are allotted for the discharge of scrap vessels. Toward the end of July or early August, the port authorities allotted a third berth for the discharge of scrap. They were responding to appeals by cargo receivers to relieve the congestion and consequent waiting time incurred by scrap vessels at

Bombay. But then shortages of trucks began to occur. On September 2, 1992, the port authorities reduced the allotted scrap discharging berths from three to two.[1]

At midnight on June 30, 1992, an India-wide transporters' strike became effective. The strike ended on July 13. No trucks were available to receive scrap cargoes at Bombay during the strike and in point of fact, no scrap vessels discharged at the port during that time.

The parties dispute the effect, if any, of the transporters' strike on the delay encountered by the Mastrogiorgis B in obtaining a berth. I draw the logical inference that the strike, which made trucks unavailable to receive scrap cargoes, contributed to the number of vessels waiting in line to discharge when the Mastrogiorgis B arrived at Bombay. However, in the view I take of the case, that finding is not necessary to the decision.

## II

■ The cargo receivers completed discharging the Mastrogiorgis B's cargo on October 4, 1992. The delay the vessel encountered in obtaining a berth caused her to exceed the reversible laytime for loading and discharging. Thus plaintiff asserts a claim for demurrage.

The liability of defendant charterer for demurrage turns upon the proper construction of clause 56 of the charterparty. That clause provides:

Should the delivery of cargo to the place of loading, or shipment or loading or discharging of cargo be prevented or interfered with by reason of war, blockade, revolutions, insurrections, mobilizations, strikes, lockouts of any class of workers, civil commotions, riots, acts of God, plague or other epidemics, the time by which loading/discharging shall be prevented or interfered with by any such cause or causes, or by other cause or causes whatsoever, whether or not of a nature or kind as enumerated above, which shall be beyond the Charterers/Receivers control, shall not

count, and demurrage shall not accrue unless the vessel is already on demurrage.

This exception clause is drafted in the broadest possible language. While "strikes" is one of the several identified exceptions, the phrase "or by other cause or causes whatsoever" takes the clause out of the doctrine of *ejusdem generis*. Accordingly the exception clause relieves defendant from liability for demurrage resulting from port congestion, so long as that congestion was "beyond the Charterers/Receiver's control," clearly the case here.

I base these conclusions upon *Steamship Rutherglen Co. Ltd. v. Howard Houlder & Partners, Inc.*, 203 F. 848 (2d Cir.1913). The charterparty in *Rutherglen* allowed a specified period of time for loading the cargo, and then provided: "The cargo to be discharged with all possible speed, according to the custom of the port of discharge." When the vessel arrived at the discharging port, "all berths where she could lie afloat were occupied or congested with freight, and neither the charterers' agents nor the master of the steamer were able to get a berth for her sooner." 203 Fed. at 851.

Reversing the district court, the Second Circuit held that the defendant charterer was not liable for demurrage. The first point of decision was that, given the circumstances just described, the charterer could not be charged "with any lack of reasonable diligence in discharging." *Id.* That holding is not squarely applicable to the case at bar, where the charterparty contained a specific daily discharging rate for the cargo.

However, the court of appeals' alternative ground for decision fully applies to the case at bar. The court said at 203 Fed. 852:

Finally, we think that, if there was delay in discharging at Dalny, the charterers are relieved from liability therefor by the exceptions contained in the charter party, viz:

"Any time lost in loading and/or discharging through riots, fire, frosts, floods, storms, strikes, lock-outs, accidents to

---

1. These factual findings are based upon the trial testimony of Owen Pereira and Chellaeam Subramanian, who had personal knowledge of

events at Bombay at the pertinent times, including the discharging of the Mastrogiorgis B.

mills or machinery, or any causes beyond the personal control of the said charterers not to be computed as part of the said laydays."

The last words cover an independent category of causes not subject to the doctrine of ejusdem generis. It is quite clear that the vessel got the first vacant berth when she could lie afloat as loaded in accordance with the practice prevailing at Dalny. (citations omitted).

Plaintiff at bar seeks to distinguish the *Rutherglen* because the charterparty in that case provided only that the cargo was "to be discharged with all possible speed, according to the custom of the port of discharge," whereas the Mastrogiorgis B charterparty called for defendant to discharge the cargo at a specified average daily rate. But I think this is a distinction without a difference. All clauses of the charterparty must be read in harmony with each other to the extent possible, so that each may be given its meaning. The provisions in clause 56 that time "shall not count and demurrage shall not accrue" must be read to contemplate and embrace the provision in clause 18 for the rate of discharge. I can discern no principled basis for distinguishing the alternative holding in the *Rutherglen* from the case at bar. The port congestion at Bombay being beyond the control of defendant, the defendant is relieved from liability for the resulting delay, including liability for demurrage. The Second Circuit's holding in the *Rutherglen* is cited as the authority for the statement in the leading American text that an exception clause of this breadth "excused delay in discharging, owing to inability to obtain a berth." Poor, *American Law of Charter Parties and Ocean Bills of Lading* (1968) at 119.

Plaintiff cites more recent awards of commercial arbitrators in New York City which arguably reach a different result with respect to a charterer's liability for port congestion. I yield to no one in my admiration for the maritime arbitrators of this City. But the

parties chose not to include an arbitration clause in the charterparty. Accordingly it is the district court that must in the first instance resolve these disputes, and in a fashion consistent with Second Circuit authority. As the Second Circuit said in another case involving demurrage: "After all, the primary question is: What did the parties contract to do?" *Steamship Co. of 1912 v. C.H. Pearson & Son Hardwood Co., Inc.*, 30 F.2d 770, 773 (2d Cir.1929). Following the alternative holding of the *Rutherglen,* I conclude that in the case at bar, the parties agreed that demurrage would not accrue during delay occasioned by port congestion that was beyond the control of the defendant charterer.[2]

### III

Given my construction, of the exceptions clause in this charter party, I need not decide whether the congestion at Bombay resulted from the land transporters' strike. But it may be useful to recite my finding on that aspect of the case as well.

I find by a preponderance of the credible evidence that the transporters' strike, which made trucks unavailable to receive scrap cargoes at Bombay during the first two weeks in July, resulted in escalating congestion and delay.

Plaintiff's Ex. 58, a review of scrap imports and discharge operations at Bombay for the period April 1992—March 1993, published by the Steel Furnace Association of India (Western Region), contains an enlightening summary of scrap vessels dates of arrival, berthing and completing of discharge at the port. Prior to the transporters' strike, vessels discharging 20,000 metric ton cargoes got in and out of the port relatively quickly. Vessels arriving in early April had completed discharge in late April or early May. Vessels arriving in early May completed discharging in early June; vessels arriving in mid-May or late May completed discharging in mid or late June; but with vessel arrivals

2. As clause 56 specifically recognizes, defendant could not avail itself of its terms if the vessel was already on demurrage when she arrived at Bombay. "Once the lay-days have expired, and the ship is on demurrage, the demurrage days run continuously," notwithstanding the provisions of an exceptions clause. Poor, *op. cit.,* at 120. But the Mastrogiorgis B was not on demurrage when she arrived at Bombay.

beginning in late June, significant slowdowns begin to appear. A vessel that did not make it to her discharging berth by early June was in trouble. P.Ex. 58 summarizes the activity on the part of Bombay's two scrap handling contractors. One of them completed the discharge on June 30 of a vessel that had arrived at the port on May 31 and was berthed on June 11. The other completed discharging a vessel on July 2 which had arrived at the port on May 22 and berthed on June 5. The next vessel handled by the first of these two contractors completed discharging on July 31, having arrived on June 21 and berthed on July 1. The next vessel handled by the second contractor completed discharging on July 24, having arrived on June 16 and berthed on June 23. These delays, which continued during the pertinent period of time, are entirely consistent with defendant's theory that a shortage of trucks during the first two weeks of July, which prevented the direct discharge of steel cargoes from vessels, contributed directly to port congestion and consequent delay in berthing scrap-carrying vessels. The experience of the Mastrogiorgis B was typical of those vessels arriving at the port of Bombay during this period of time.

The lingering effect upon the port of the transporters' strike, demonstrated by a preponderance of the evidence, is sufficient to bring the resulting delay of the Mastrogiorgis B in berthing within the strike exception in clause 56. That is the conclusion reached by Judge Learned Hand in *The Nordhvalen,* 1923 A.M.C. 398 (S.D.N.Y.1923) (not officially reported). Cargo at the discharge port in question had to be discharged into lighters. A strike of longshoreman had prevented the lighters from being discharged. The strike had been called off when the vessel arrived, but she had to wait for enough lighters to be discharged before her own cargo could be worked. Judge Hand held that the strike exception covered the case: "The *Nordhvalen* was as directly held up by the past strike as she might have been by a present one." 1923 A.M.C. at 399. In reaching that conclusion, Judge Hand cited and followed an English case, *Leonis S.S. Co. v. Joseph Rank, Ltd.,* 11 Asp.M.C. 162. He regarded *Leonis* as "precisely in point," saying of it: "There

the strike and insurrection had ended before the *Leonis* arrived at Bahia, but the harbor was filled with vessels with full hulls. The consequent delay was held to fall within a similar [strike] clause." *Id.*

In *The Nordhvalen,* Judge Hand distinguished a First Circuit case *Niver v. Cheronea S.S. Co.,* 142 Fed. 402 (1st Cir.1905), where the cause of the crowded harbor was not a strike on wharves, but in the Pennsylvania mines (the charterparty was for the carriage of a cargo of coal). That general strike created a great demand for coal in New England, with the result that Boston Harbor was crowded by vessels beyond its capacity. Judge Hand held that the exception for strikes did not relieve the charterer from liability for demurrage, reasoning that "[a]s the strike had been on before the charter party was written it could not of course be regarded as an event not then in contemplation." 1923 A.M.C. at 399.

Plaintiff at bar seeks to bring itself within the *Niver* case by arguing that defendant, advised by its Bombay agents, should have foreseen the transporters' strike. But there is no substance to this argument. The charterparty of the Mastrogiorgis B was executed on June 19, 1992. The most that can be said from the trial evidence is that the possibility of a transporters' strike in India was known at that time, but there were widely held hopes for a settlement. There is a quantum difference between the possibility of a strike, which might yet be averted, and a strike in existence at the time the shipowner and charterer executed the charterparty. When the strike actually began, at midnight on June 30, the Mastrogiorgis B was at sea, bound for Bombay, having sailed from New York with her cargo on June 25.

## IV

■ I must now deal with an argument that plaintiff makes to place liability for demurrage upon defendant, notwithstanding the existence of port congestion at Bombay, whether strike generated or not.

Clause 30 of the charterparty provides:

Charterers' privilege to load and unload from or into lighters at berths and/or an-

chorages. Lighterage and lightening, including fendering, if any, at either end, to be for Charterers' expense, time counting.

Plaintiff argues that in the light of this clause, defendant could and should have discharged the Mastrogiorgis B's cargo into lighters at the anchorage, so that it cannot be said that the delay was "beyond the Charterer's control" within the purview of the exceptions clause, clause 56.

I reject that contention. In the first place, the Second Circuit held in the *Rutherglen* that a comparable clause gave "the Charterers the privilege of requiring the vessel, if lightened, to go to a wharf where she could not lie afloat with all cargo aboard. They are not obligated to order her to such a berth." 203 Fed. at 852. The present parties' contemplation, as expressed in the charterparty, was that the vessel would proceed to a safe *berth* in Bombay to discharge. While defendant had the option to discharge into lighters at the anchorage, it was not obligated to do so.

In any event, the defendant cannot be taxed for failure to undertake a task that was not feasible. Discharge of the scrap cargo into lighters at the anchorage would have to be accomplished by the vessel's gear. But it appears to be common ground that the vessel's cargo handling gear could not operate sufficiently well to discharge this steel scrap cargo. That is presumably the reason why the cargo was discharged by shore cranes when the vessel finally reached her berth.

And even if that were not so, the testimony of plaintiff's own witness Pereira made it clear that in 1992, only a limited number of barges, less than ten, with a capacity of only 100 to 500 tons, were available for the lightening of scrap vessels at anchorage. Furthermore, only one daylight shift could be worked at the anchorage during the monsoon season, namely, July and August. The Mastrogiorgis B was loaded with more than 21,000 metric tons of scrap. Whatever the proper construction of clause 30, defendant did not have the practical option of discharging such a cargo into lighters at the anchorage.

V

Lastly, plaintiff argues that in prior correspondence, defendant acknowledge a substantial indebtedness to plaintiff for demurrage, and should now be estopped from relying upon the exceptions to that liability set forth in clause 56 of the charterparty. Plaintiff also makes reference to the doctrines of waiver and laches.

There is no substance to these contentions. I do find it somewhat surprising that defendant's witness Denis Mittleman, ostensibly an experienced chartering executive for defendant, professed such ignorance of the charterparty's terms during the early days of the controversy. But the Court's task is to divine the parties' rights and obligations from the contract; and the ignorance, blissful or otherwise, of a particular witness plays no part in that analysis. Furthermore, the comments by defendant or its agents during the early exchanges of communications about demurrage owing to plaintiff may be explained, at least in part, by defendant's desire to put pressure upon the cargo receivers, to whom defendant would look for demurrage or indemnity.

While of course plaintiff would prefer not to be confronted with a defense based upon clause 56, it is not unfairly prejudiced by the defense now asserted by defendant, which arises squarely out of the contract to which plaintiff agreed.

VI

Defendant contends in the alternative that if demurrage accrued at the discharge port, its liability is cut off by the cesser clause in the charterparty.

Clause 8 of the charterparty provides:

8. Owners shall have a lien on the cargo for freight, dead-freight, demurrage. Charterers shall remain responsible for dead-freight and demurrage, incurred at port of loading. Charterers shall also remain responsible for freight and demurrage incurred at port of discharge, but only to such extent as the Owners have been unable to obtain payment thereof by exercising the lien on the cargo.

This clause gave plaintiff a lien on the scrap cargo for demurrage, and provided further that defendant was responsible for demurrage incurred at the port of discharge, but only to the extent that plaintiff was unable to obtain payment of charterparty demurrage by exercising that lien. Poor, *op. cit.* at 74, summarizes the effect of a cesser clause: "The personal liability of the charterers and the right to hold the goods for freight, dead-freight and demurrage are regarded as equivalents and, in order to deprive the owner of the personal responsibility of the charterer, the owner must be given a right against the goods."

But it has also been held that if as of the result of conditions at the port of discharge the shipowner's right of a lien on the cargo could not be exercised as a practical matter, the charterer was not relieved by the cesser clause from liability for demurrage. *The Sinoe,* [1972] 1 Lloyd's Rep. 201 (C.A.).

In view of the substantial delay encountered by the Mastrogiorgis B at Bombay, plaintiff was aware of a significant potential claim for demurrage. On September 30, 1992, as the vessel lay discharging at her berth, plaintiff exercised its charterparty lien on the cargo by closing the vessel's hatches and stopping the discharge. By taking that action, plaintiff protected itself against the cessation of defendant's responsibility for demurrage by operation of the cesser clause.

Plaintiff's action gave rise to a further spate of consultations and communications between all concerned parties. Later on September 30, 1992, defendant faxed to plaintiff a waiver by defendant of the cesser clause. The pertinent paragraph in that communication reads as follows:

Charterers have today received a copy of communication between buyers/receivers and although not fully satisfied, charterers in order to avoid further delays, risks and expenses for all concerned parties accept Owners proposal to waive C/P Clause No. 8, Lien (Cesser) Clause.

Defendant now contends that plaintiff obtained this waiver by defendant of the cesser clause's protection by wrongful duress.

As factual predicates for that contention, defendant says that closing the vessel's hatches would inevitably lead to her removal from the berth [3], and that plaintiff could and should have preserved its lien upon the remaining cargo by discharging it into lighters.

I conclude that plaintiff did not obtain defendant's waiver of the cesser clause by duress. Accordingly, if contrary to my conclusions stated *supra* that demurrage had not accrued at Bombay, the cesser clause, having been waived by defendant, would not protect defendant from liability.

I apply New York to the question of duress. The charterparty was entered into in New York. Neither party suggests the applicability of any other law.

Defendant's argument must be that its waiver of a contractual right or remedy was obtained by duress. Under New York law, "A contract is voidable on the ground of duress when it is established that the party making the claim was forced to agree to it by means of a wrongful threat precluding the exercise of his free will." *First National Bank of Cincinnati v. Pepper,* 454 F.2d 626, 632 (2d Cir.1972), citing and quoting *Austin Instrument, Inc. v. Loral Corp.,* 29 N.Y.2d 124, 130, 324 N.Y.S.2d 22, 272 N.E.2d 533 (Ct.App.1971).

"A wrongful threat" is a key element in this analysis. A party acting to enforce its contractual or legal rights cannot be charged with duress as a matter of law. *Pepper* involved the assertion by Pepper, an attorney, of a retaining lien upon materials owned by a corporation called Modern Talking Picture Service, Inc. ("Modern"). His retention of those materials prevented a sale of Modern's stock to a third party, to the stockholders' distress: just as the action of the master in closing the Mastrogiorgis B's hatches prevented completion of the discharge of her cargo, to the cargo receivers' distress. To resolve the impasse, the Modern stockhold-

---

**3.** It is hard to see how this eventuality would have prejudiced defendant. If the vessel lost her berth and encountered further delay as the result of plaintiff's liening the cargo, that time would not have counted against defendant.

ers compromised the attorney's claim, but subsequently asserted that the compromise agreement was the product of duress inflicted upon them by the attorney.

The Second Circuit, construing New York law, reasoned that the case turned upon whether or not attorney Pepper had a valid lien upon Modern's materials. The court of appeals said at 454 F.2d at 633:

> If [Pepper's] lien was valid in any respect (which the stockholders vigorously deny) his insistence upon it could not have subjected the stockholders to duress, for generally it cannot be duress for a party to insist upon his legal rights. (citations omitted).

On the other hand, if the attorney "had no right to a lien upon Modern's papers, ... then his assertion of a lien would have been unlawful and would hardly constitute a defense to a charge of duress." *Id.*

In the case at bar, there is no question that clause 8 of the charterparty gave plaintiff the right to lien the remaining cargo. Indeed, the operation of the cesser clause required plaintiff to do so, if it was to protect its interests. Duress is not made of such stuff as this.

There is no substance to defendant's contention that plaintiff should have discharged the liened cargo into lighters. Clause 8 of the charterparty gave plaintiff the right to lien the cargo to secure a demurrage claim, but did not specify the method by which the lien should be exercised. Assuming without deciding that defendant has standing to question the particular choice that plaintiff made, plaintiff's decision not to discharge the cargo into barges was reasonable in the circumstances. A leading Bombay lighterage company refused in writing to provide barges for liened cargo, because of the problems the lien makes for the barge owners. The Bombay lighterage company made that quite clear in a letter dated September 30, 1992 to the vessel's agent, which concluded: "In view of the above, we regret we are unable to provide you with any barges for liened cargo." P.Ex. 13. Defendant argues in a conclusory fashion that plaintiff could have solved these problems by paying the lighterage company in advance, but this contention does not rise above the level of speculation. Before deciding to close the hatches, plaintiff considered its options, consulted counsel, and acted upon counsel's advice.

It follows that if upon appeal defendant should ultimately be held liable for demurrage, its valid waiver of the cesser clause would not relieve defendant from that liability.

## VII

For the foregoing reasons, plaintiff's claim for demurrage fails and defendant's counterclaim for despatch succeeds.

My understanding is that the amount of despatch is not at issue. If I am wrong in that, the question may be addressed by the settlement of cross-judgments.

Counsel for defendant are directed to settle a judgment consistent with this opinion on seven (7) days' notice, no later than April 5, 1996.

It is SO ORDERED.