### L. N. DANTZLER LUMBER CO. v. CHURCHILL.

(Circuit Court of Appeals, Fifth Circuit. April 4, 1905.)

#### No. 1,436.

1. SHIPPING—DEMURRAGE—LAY DAYS FOR LOADING.

Under a provision of a charter party that lay days for loading should commence on notice of readiness by the master, to render such notice effective to start the lay days to running the vessel must have been at her wharf, ready to load, when it was given.

2. SAME.

Evidence considered, and *held* to show that a delay of several days in loading a vessel with lumber was due to the fact that the stevedore employed by the master to stow the cargo did not have men to do the work during such days, and not to the failure of the charterer to furnish cargo.

[Ed. Note.—Demurrage, see notes to Harrison v. Smith, 14 C. C. A. 657; Randall v. Sprague, 21 C. C. A. 337; Hagerman v. Norton, 46 C. C. A. 4.]

Appeal from the District Court of the United States for the Southern District of Mississippi.

J. I. Ford, for appellant.
W. M. Denny, for appellee.

Before PARDEE, McCORMICK, and SHELBY, Circuit Judges.

PARDEE, Circuit Judge. This is a libel for demurrage claimed because the charterers of the barkentine Hornet did not furnish

cargo for loading within the loading days stipulated in the charter party.  The charter party provides:

"It is agreed that the lay days for loading and discharging shall be as follows, (if not sooner dispatch), commencing from the time the captain reports his vessel ready to receive or discharge cargo.

"Lay days not to commence before Friday, Dec. 18th, 1903.  Loading and discharging with all possible dispatch, but not less than 25 M. ft. daily loading and discharging Sundays and legal holidays excepted.  And that for each and every day's detention by default of said party of the second part, or agent $40 per day shall be paid by the party of the second part, or agent, to the said party of the first part, or agent.  The cargo or cargoes to be received and delivered alongside, within reach of vessel's tackles."

The amount of cargo loaded on the Hornet was 298,794 superficial feet, requiring, at 25 M feet delivery per loading day, 12 days for loading.  At the time the charter party was entered into in Mobile, Ala., December 16, 1903, the Hornet was at Ship Island.  When she was removed to Gulfport, the port of loading, does not exactly appear.  The master testifies she was ready to receive cargo on the 16th; that he gave verbal notice to the Dantzler Company, through some one belonging to the Dantzler Company (he does not know who), on the 17th, he thinks, to employ a stevedore; and that he had his stevedore ready.  He further testifies, "We came in on the 16th, 17th, and 18th."  On the morning of the 18th he mailed written notice as follows:

"Gulfport, Dec. 18th, 1903.

"L. N. Dantzler Lumber Co., Moss Point—Gentlemen: I beg to give you notice that the Bktn. Hornet is ready for cargo.  Lay day commence, according to Charter Party, from this day.

"Yours truly,                                  J. S. Churchill,
                                         "Master of Bktn. Hornet."

Moss Point was 30 miles away, and in due course of mail the written notice was received on the afternoon of the 18th.  As the evidence fails to show that the Hornet was at her wharf in Gulfport before the 18th, and as the general rule is that notice of a ship's readiness to receive cargo can be properly given only after the ship is ready and at her proper place for loading (see Maclachlan, 411), we take it that the only sufficient notice given in this case was the written notice given December 18th, and that, as that notice was not received until the afternoon of that day, the loading days did not commence against the charterers, under a fair construction of the charter party, until the next day, which was Saturday, the 19th of December.  The vessel was not loaded with full cargo until January 11, 1904, a period of 18 days, including December 19th and January 11th, and excluding Sundays and holidays.  This was 6 days more than the loading days allowed under the charter party, for which the libelant would be entitled to recover demurrage if the delay was caused by the charterer's failure to furnish cargo.

The case shows that six working days were lost from the 23d of December to and including December 31st, and the real issue on this libel is whether the charterers are responsible for this loss through failure to deliver cargo as stipulated.  Under the charter party it was incumbent upon the ship to furnish a stevedore and

load the cargo. The master testifies that he let the loading of the cargo to a Mr. Ladnier, who sublet to another man—Mr. Ladnier's foreman, he believed. An extract from the master's cross-examination shows:

"Q. How many days about Christmas time did you not receive any cargo abroad? A. Four or five days there— I don't know how many in the vessel on the 20th or the 24th loading the cars— I think so. Q. Which one? A. I don't know. Q. Do you swear that the stevedore that loaded your vessel had a force of men sufficient to take on board twenty-five thousand feet of lumber per day from the 18th to the 24th and from the 26th to the 1st of January? A. I suppose he did. He never made any complaint. The only trouble, we didn't have any cars. Q. He didn't have any reason to complain to you about the men? A. No, sir. Q. You didn't have anything to do with the employment of the men? A. Yes, sir; I was there every day, and they told me there was no cars. Q. That man was your agent? A. No, sir. Q. Whose was he? Dantzler's? A. I employed him. Q. Do you know that the man had a full force of men ready all the time to receive the cargo alongside of your vessel from the 18th? A. Yes, sir; I think so. He told me he didn't have any trouble. Q. Did you know the stevedore that had the subcontract? A. He could not put the cargoes on board, for there was none there for him to do it. That is certain. Q. Give me the days cars were delivered alongside, and the days there were none? A. I have on here. (Pulling a paper from his pocket.) Q. Let's see it? (Witness hands counsel a paper.) Q. You had nothing to do with the employment of the men that the stevedore employed? A. No, sir. Q. You had nothing to do with it? A. No, sir. Q. You didn't pay the wages of the men that were employed? A. No, sir; I paid the stevedore in full for the job."

A witness of the charterers (John Poke) testified that he was the stevedore who had charge of the employment of the necessary men and of the loading of the Hornet. Among other things, he testified:

"Q. Did you have anything to do with the barkentine Hornet, which loaded at Gulfport December, 1903, and January, 1904? A. Yes, sir. Q. What did you have to do with the loading of that vessel? A. I was supposed to be the contractor. It was made through Mr. Ladnier with the captain of the vessel. He asked us himself. Q. Which Mr. Ladnier made the contract with the captain? A. Mr. Will Ladnier was the one that spoke to him. Q. Who employed the men that stored the cargo in that vessel? A. I did. Q. Was any time lost in loading that vessel along about Christmas time of the year 1903? If so how much time was lost? A. Near as I can get at it, something about four or five days. About five days, I reckon. Q. What caused the loss of that time? A. Could not get the men. Q. Who could not get the men? A. I could not get them. Q. If you could have gotten the men to work during that time, would any time have been lost on account of lumber not being there? A. I don't see where they could have been any loss. They would give us the lumber as we asked for it. There was lumber there when we stopped. Q. Was there any time during the time of the loading of that vessel that there was no lumber alongside of the vessel to be loaded on the boat? A. No, sir; when we started there was about five cars there, and when we knocked off we left one there on the main line. They left them on the main line, and we got them as we asked for them. Q. When did you knock off for Christmas? A. On Wednesday evening before Christmas. Q. Was there lumber alongside of the vessel the time you knocked off? A. Yes, sir. Q. When you went back to work again, was lumber promptly furnished by the L. N. Dantzler Lumber Company? A. Yes, sir. Cross-examination: Q. You say you knocked off Wednesday evening? A. Yes, sir; for Christmas. Q. Were there any car loads of lumber placed to the vessel on Wednesday evening before Christmas? A. There was a car lying there on the side track. When we wanted them they would put them on the main line for us as we asked for them. I told the switchman that we were going to knock off, and that he need not put the car in there; we would not be able to take it off that day. Q. Then there"

was no cars delivered to the vessel except as you directed? A. No, sir; except as we asked for them. Q. Were you there on Christmas Day, the 25th? A. No, sir; I was home. Q. There on the 26th? A. No, sir; Saturday I was not there. Q. And there was no cars placed to that vessel except as you directed? A. As we asked for them; the cars we left were for their vessel. Q. How many cars were left there? A. One there, and some more in the yards—so the switch-engine man told me. Q. The statement that you make that lumber was there all the time is made on information you received from the railroad people? A. I saw these cars. * * * Q. When was it put there? A. It was there the day we began to load the vessel. They would put the cars in on the siding, and switch them in on the main line as we asked for them. Q. That car was there on the evening of the 23d—that was Wednesday before Christmas—and had been there before the vessel had started loading? A. Yes, sir; about that long; four or five cars—I don't know how many—lying there; and, as we would ask for them, they would put them on the main line for us. Q. How many car loads of lumber did you discharge a day, and take aboard of that vessel? A. About two. Sometimes three. Two is about the best that I can tell about. Q. How many car loads did you put aboard the vessel on the 23d, Wednesday? A. I think about two we put on there, if I am not mistaken. I think we put two, or one and part of another one. Q. Why didn't you take the other car that was there? A. It was about four o'clock, or a little after, and the men were ready to go home, and just as we knocked off for Christmas. Q. You say you were subcontractor? A. The contract was made something like them— Mr. Ladnier met me up here one day and asked me, did I want to load a schooner or barkentine, and I told him, 'Yes; I would load it.' He said he didn't care to do it himself; something like that; he was 'ground out'—and asked me, did I want to take the job. I said, 'Yes.' He said, 'I will tell the captain,' and I said, 'All right;' and, as he started off, I said, 'Hold on. Let me find out what I am going to get out of the captain.' He said, "70 cents; will try to get that; if not, I will try to get it for 65 cents. I want to help the fellow out.' I said, 'All right,' and he told me about the cargo; and he went on and told the captain, and told me to have a gang there, and told me when to have the gang there, and he told me he would tell the captain when he was ready to start. Q. Then the contract was made between the captain and Mr. Ladnier as to the loading of the vessel? Your contract was made with Mr. Ladnier to take the vessel? You didn't make any contract with the captain? A. No, sir; I had oral contract with him; didn't have any writing."

The mate of the Hornet (the most intelligent witness for the libelant) testifies, in a general way, that from the 23d of December to the 1st of January there were men on the ship ready to work at loading, and that no cargo was loaded because none was delivered. Whether the men about, staying on the ship, who were ready to work at loading, belonged to the crew, or were a part of the stevedore's gang, the mate does not say. This witness furnishes a statement of the receipt and unloading of cars delivered to the ship, and this agrees in the main with Catchot's statement; and on cross-examination he admits that lumber was furnished on the 26th that the stevedore refused to load.

The only other witness for the libelant was one of the crew of the Hornet, a foreigner not well acquainted with the English language, who admitted himself drunk on the examination, and who only swore generally about men being around ready for work.

The agreed statement made by Mr. Catchot, who is admitted to be a reliable witness, and who was in charge of the railroad, handling all the lumber, shows that four cars were placed to the vessel on December 21st, three on December 22d, and one on De-

cember 26th, and that this latter was not unloaded until January 1st, and that during Christmas week there were on hand in the railroad yards three other cars, not placed at the vessel until January 1st. There is no evidence to show that between December 23d and December 31st the charterers were called on to deliver any cargo, or that they were not ready to deliver cargo according to contract, and the preponderance of the evidence is that during that period the ship was not ready to receive cargo through want of stevedores and laborers. And certain it is that the ship stevedore testifies, without contradiction, that he notified the switchman of the railroad on December 23d he need not put a car in, as "we would not take it off that day."

On the whole case, we are of opinion that, under the evidence, the blame for losing the days from December 23d to January 1st, as loading days under the charter party, lies with the stevedore and his gang, who did not work during the holiday period; and for the shortcomings of the stevedore the owners, and not the charterers, are responsible.

The decree of the District Court is reversed, and the cause is remanded, with instructions to dismiss the libel.