ANDERSON et al. v. J. J. MOORE & CO.

(Circuit Court of Appeals, Ninth Circuit. May 9, 1910.)

No. 1,808.

1. SHIPPING (§ 181*)—DEMURRAGE—CONSTRUCTION OF CHARTER PARTY—ARRIVAL OF SHIP—LAY DAYS—"READY TO DISCHARGE."

A charter party of a ship to carry a cargo of coal from New Castle, Australia, to San Francisco, there to be discharged "as customary, in such customary berth as consignees shall direct," lay days to commence when the vessel was "ready to discharge," on written notice by the master, gave the consignee the right to designate any customary place for discharging, and the ship did not reach her destination, and was not ready to discharge, so as to be entitled to give the notice, until she was in the berth assigned; and where the master was promptly notified on arrival in port that the cargo had been sold to a fuel company and was to be discharged at its bunkers, which were customary places for discharging coal, a delay of 42 working days while awaiting her turn to discharge at such bunkers, which was required by the custom of the port, was at her own risk, and did not entitle her to recover demurrage, the delay being without fault of the charterer, but caused by a congestion of coal vessels in the port at the particular time.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 589–592; Dec. Dig. § 181.*

For other definitions, see Words and Phrases, vol. 7, pp. 5935, 5936.

Demurrage, see notes to Harrison v. Smith, 14 C. C. A. 657; Randall v. Sprague, 21 C. C. A. 337; Hagerman v. Norton, 46 C. C. A. 4.]

2. SHIPPING (§ 181*)—CONSTRUCTION OF CHARTER PARTY—REASONABLENESS OF PROVISIONS—LAY DAYS.

A deliberate contract, made by the parties in a charter party, giving the charterer the right to designate the place of discharge, and providing that lay days shall commence when the vessel is ready to discharge, cannot be varied or relaxed on the ground that its enforcement subjects the vessel to an unreasonable delay.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 589–592; Dec. Dig. § 181.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Appeal from the District Court of the United States for the Northern District of California.

Suit in admiralty by Andrew Anderson and others, as owners of the ship Columbia, against J. J. Moore & Co., a corporation. Decree for respondent (173 Fed. 539), and libelants appeal. Affirmed.

H. W. Hutton, E. B. McClanahan, and S. H. Derby, for appellants. William Denman, for appellee.

Before GILBERT, ROSS, and MORROW, Circuit Judges.

GILBERT, Circuit Judge. On June 26, 1907, the American ship Columbia, owned by the appellants, was chartered by the appellee for a round voyage via Newcastle, N. S. W., there to take on a cargo of coals, and thence proceed to San Francisco. The terms of the charter party material to this case are the following:

"And, being so loaded, shall proceed to San Francisco Harbor, Cal., to discharge at any safe wharf or place within the Golden Gate, and deliver the said full and complete cargo in the usual and customary manner at any safe wharf or place, or into craft alongside, as directed. * * * Frosts or floods, fire, strikes, lockouts, or accidents at the colliery directed, or on railways, or any other hindrance of what nature soever beyond the charterer's or their agent's control, throughout this charter always excepted. * * * To be discharged as customary, in such customary berth as consignees shall direct, ship being always afloat, and at the average rate of not less than 150 tons per weather working day (Sundays and holidays excepted), to commence when the ship is ready to discharge and notice thereof has been given by the captain in writing. If detained over and above the said laying days, demurrage to be at 3d. per registered ton per day."

The vessel arrived in San Francisco Harbor on January 14, 1908, and on the following day notice was given the appellee that the ship—

"has arrived at this port, and entry effected at custom house. Vessel is awaiting your orders, and lay days will commence as per charter party."

On the same day the master called at the appellee's office and asked where he was to discharge. The answer was that the appellee did not know, and that there would "not be anything done for three or four weeks to come." There was testimony, however, and the trial court found the fact to be, that, two days after the ship's arrival, J. J. Moore, the president of the appellee, told Capt. Nelson, the managing owner of the vessel, that the cargo of coal had been sold to the Western Fuel Company, and that the ship would dock at their bunkers. On January 18th a second notice was sent by Capt. Nelson to the appellee, saying:

"You will please take notice that, as per notice served upon you January 15, 1908, ship Columbia has arrived at San Francisco and has been ready to discharge on and since said 15th day of January. Please procure and advise me of place of discharge. Demurrage will be charged as per charter party."

There was further correspondence between the parties, not necessary here to be set forth. On March 16, 1908, the appellee gave notice that the vessel be docked at the Folsom Street bunkers of the Western Fuel Company at 11 a. m. of the following day, and she was finally discharged at 1 p. m., March 20, 1908. She was detained in San Francisco Harbor 67 days, and the appellants contend that she was detained more than 42 days beyond her lay days. The trial court held

that on January 16th the appellee properly· and sufficiently .exercised the option, given it by the charter party, to name a discharging berth, and that the.place so designated was to be regarded as if specifically named in the charter party as the place of delivery, and that hence the Columbia's voyage did not terminate until she reached it, and that until then she was not ready, or entitled to give notice of readiness, to discharge her cargo. The reason for the delay in discharging the cargo was that, during the period of delay, other vessels which had arrived ahead of the Columbia, were discharging coals at the only available bunkers. During the months of January, February, and March there was an extraordinary and general congestion of shipping in the port of San Francisco. There had been a coal famine in the winter of 1906 and 1907, and the coal which caused the congestion a year later had been ordered at that time. Although the Columbia was chartered by the appellee on June 26, 1907, the coal which she carried had been sold to the Western Fuel Company under a contract made on November 24, 1906, more than a year before the congestion. The delay in discharging cargo in the port began soon after January 1, 1908. The evidence indicates that the congestion was induced, in part at least, by the financial depression of 1907, which had the effect to thrust upon the Western market coals which otherwise would have been shipped to Eastern points. The congestion was not caused by the act of the appellee. No vessel chartered by it had been discharged at the Western Fuel Company's bunkers for two months prior to the arrival of the Columbia. It was shown to be the custom of the port that vessels arriving in port were discharged in the order of their arrival, and this custom was observed in the present case, with the un-important exception that a schooner which arrived after the Columbia was permitted to discharge 300 tons at the Western Fuel Company's bunkers on February 22d,, a national holiday.

The first question presented on the appeal is: When did the lay days begin to run? Under the charter party they did not begin to run until the ship was "ready to discharge" "in such customary berth as the consignee shall direct." The court below held, and we find no error in its conclusion, that under such a provision in the charter party the vessel is not ready to discharge until she is in position to deliver her cargo to the consignee in the berth which he designates to her. By the terms of the charter party the appellee, at its option, could direct the vessel to discharge at any safe wharf or place within the Golden Gate, or into craft alongside, and in the exercise of the option the appellee informed the managing owner of the vessel that she was to discharge at the Western Fuel Company's bunkers. The fact that there were three berths at the bunkers did not render the notice so indefinite as to be invalid, since the bunkers were under one management, and, aside from this, the notice was accepted as sufficient, for no request was made for a more definite designation. In Hutchinson on American Law of Carriers, § 848, it is said:

"Lay days at the port of loading do not begin to run against the charterer until the master gives notice to the charterer that his vessel is ready to re-ceive cargo. Such a notice can properly be given only after the ship is ready and. at her proper place for loading."

And the same authority says that the charterers will not be liable—

"for a delay occasioned by the ship being unable to proceed to the designated berth, owing to the crowded condition of the dock."

The rule so formulated is well sustained by English and American decisions. In Murphy v. Coffin & Co., 12 Q. B. D. 87, the charter party provided that the vessel deliver her cargo—

"alongside consignees' or railway wharf or into lighters, or any vessel or wharf where she may safely deliver, as ordered."

Matthew, J., said:

"It is the ordinary and reasonable rule that the lay days under a charter party do not begin to run until the vessel has arrived at her place of destination. * * * When the vessel arrived in the dock at Dieppe, she was ordered to discharge at the railway wharf, which was then occupied by other vessels, so that there was no berth vacant for her, and it was not until she obtained one that she was in a position to discharge her cargo."

And the court held that the railway wharf was the only place of destination under the charter party, and that the lay days did not begin to run until the vessel had secured a berth there, and the court criticised Davies v. McVeagh, 4 Ex. D. 265, relied upon by the appellants herein, as "inconsistent with all the decisions."

In Tharsis Sulphur & Copper Co. v. Morel Bros., 2 Q. B. D. 647, by the charter party the vessel was to proceed to the Mersey and deliver her cargo at any safe berth, as ordered on arrival in the dock at Garston. It was held that the obligation of the charterers to unload did not commence until the vessel was berthed. Said Lord Esher:

"The contract does not express any particular berth: but it does express the equivalent to that in using the words 'as ordered,' which I take to mean as ordered by the charters. Does that give the charterers the right to fix the place where the carrying voyage is to end? Even without authority, I should say that it did. But Tapscott v. Balfour, L. R. 8 C. P. 46, has dealt with a charter party in a similar form, where a particular dock has to be named; the necessary result of the agreement being that, when the charterer exercises that power, the result is the same as if the dock had been named in the charter party. That was decided 19 years ago, and, as it was a decision on a question of frequent mercantile interest, we should not interfere with the decision, unless we were fully convinced that it was wrong. So far from entertaining that opinion, I think the decision was quite right, and that, when the charterer has to name a dock or a place in a dock, when he does so, it is as though it had been named in the charter party, and indicates the termination of the voyage. To hold otherwise would be to give no effect to the words 'as ordered.' "

Bowen, L. J., and Kay, L. J., were of the same opinion.

In Leonis Steamship Co. v. Rank, 1 K. B. Div. 499, it was held, on the other hand, that when the place of loading named in the charter party is a port or other wide district, as distinguished from a case where the charter party gives the charterer in express terms the right to order a vessel to a distinct and precise loading spot, the lay days begin when the ship is ready within the named place; but in that case the Court of Appeal, in opinions by Buckley, L. J., and Kennedy, L. J., assented to by Lord Alverstone, incidentally approved the doctrine of Tharsis Sulphur Co. v. Morel, and Kennedy, L. J., said:

"It is settled law that the point of destination is equally to be treated as designated in the charter party, whether the point be named in the document

by its local title, or there is in the charter party an express reservation to the charterer of the privilege to fix the point of destination by his order or direction"—citing Tharsis Sulphur Co. v. Morel and other cases.

The leading American case is W. K. Niver Coal Co. v. Cheronea S. S. Co., 142 Fed. 402, 73 C. C. A. 502, 5 L. R. A. (N. S.) 126. The charter provided that the vessel was to deliver the cargo alongside of any wharf or vessel, or craft, as ordered, where she could safely deliver, always afloat, or she might be required to deliver a part at a wharf, and a part at other wharves, and a part into a vessel or other craft, or into other vessels or other crafts. In the opinion Judge Putnam said:

"According to the primitive rule, a charterer who agrees to furnish a cargo for a vessel, and to discharge it, is bound to have the cargo ready when the vessel is ready, and to receive the cargo immediately on its arrival at its port of destination. This primitive rule applies to all contracts concerning the handling of merchandise, alike of sale, transportation, or bailment of any kind; but within the last century, in view, partly, of the necessities of coal ports, and of ports for shipment and receipt of ores and grain, and the modern facilities peculiarly provided at terminals for handling the immense masses of such merchandise now required to be handled, this rule has somewhat yielded, as is fully explained in Scrutton's Charter Parties and Bills of Lading (5th Ed. 1904) 17 to 22. This has gone so far that this author says, in effect, at pages 259, 260, and 261, that a mere obligation to load or to unload imports a stipulation that the work shall be done according to the settled and established practice of the port. Mr. Scrutton says, in effect, at page 260, that it has needed a long series of decisions to accomplish this proposition. The same series of decisions has also established the further proposition that, aside from any peculiar custom, the consignee has a right, to a certain extent, to select a particular wharf or berth for discharge of the vessel, although that berth or wharf may be occupied when the vessel is ready to unload, for that reason delaying her, and this not only under charter parties like those now before us, containing the words 'as ordered,' but also where neither these words nor an equivalent expression are found. This is not only the settled law in England, but it is the apparent law in the United States. Accordingly, alike with regard to the port of lading and the port of discharge, large margins are given charterers, which have resulted in long detentions to vessels, extremely burdensome, but for which compensation has been refused."

Among other cases in point are Flood v. Crowell, 92 Fed. 402, 34 C. C. A. 415; Dantzler Lumber Co. v. Churchill, 136 Fed. 560, 69 C. C. A. 270; Harding v. Cargo of Coal (C. C.) 147 Fed. 971.

The appellant contends that, granting the construction of the charter party to be as we have indicated, and that under its terms a berth was designated on January 15th, the designation was nevertheless ineffectual, for the reason that the berth was not one that could be occupied within a reasonable time, and the appellant quotes the language of Bowen, L. J., in Tharsis Sulphur Co. v. Morel, where he said:

"The most that can be said is that the charterer does not exercise his option unless he names a berth that is free or is likely in a reasonable time to be so."

And from Charlton Steamship Co. v. Castle Mail Co., 2 Q. B. Div. 485, in which Lord Esher said:

"I think the order to be given must be for a berth to which the ship can go within a reasonable time, and there load, always afloat."

And from Williams v. Theobald (D. C.) 15 Fed. 472, in which it was said that a reasonable detention might be deemed within the contemplation of the parties, "but even then not any permanent or protracted detention." But Bowen, L. J., in connection with the remarks above quoted from his opinion, also said:

"To limit the option of the charterer, by saying that in the choice of a berth he is to consider the convenience of the ship owner, is to deprive him of the benefit of his option."

In Williams v. Theobald the cargo was to be delivered alongside any craft, steamer, floating depot, wharf, or pier, as might be directed by the consignees, to whom notice was to be given of the vessel being ready to discharge. The consignees named a wharf to which, because of its crowded state, the vessel could not enter, and by reason thereof the delay occurred. The court held the charterer liable for the detention, and construed the charter as making the lay days run from the time of arrival in port, and not from the time of arrival in the discharging berth; it not being expressly agreed that the lay days should run after the vessel was ready to discharge, and it was shown, moreover, that the delay was occasioned by the arrival at the harbor of an extraordinary number of vessels with cargoes of coal, but all brought by the charterer.

The language quoted from the opinion of Lord Esher in Charlton S. S. Co. v. Castle Mail Co. was used with reference to a charter party in which there was no provision for fixing the lay days, and the court held that the cargo should be discharged in a reasonable time, without saying what would be "a reasonable time." On appeal to the House of Lords (8 Asp. Mar. Cases, 402) it was held that the question on which the court below decided the case did not arise, that the difficulty existed in respect, not to a particular berth, but to the entire dock and all the berths in it, and that the question was whether, having regard to the tidal conditions of the port, there had been any unreasonable delay in the loading. But none of the expressions of opinion so quoted purport to, or do in fact, go so far as to intimate that the deliberate contract of the parties may be varied or relaxed on account of the unreasonableness of any of its provisions. The power to make such contracts is, as was said by Lord Esher in the Charlton Steamship Co. Case, a "power given to the charterers for business reasons." The owner of the vessel has it in his power to relieve himself of the embarrassment of indefinite detention, and the uncertain losses resulting therefrom, by inserting appropriate words in the charter party. The parties in this case saw fit to employ in the charter party terms which had been the subject of judicial construction, and whose fixed and settled meaning they must have known. Had the intention been other than these words indicate, we must assume that other well-known terms would have been inserted, such as that "the vessel shall have quick dispatch," or that "the unloading shall begin when the vessel is ready, whether in berth or not," or that "the lay days shall begin 24 hours after arrival in port," or that "the vessel shall be discharged promptly." Said Judge Brown in Fish v. One Hundred and Fifty Tons of Brown Stone (D. C.) 20 Fed. 201:

"It is in the power of the vessel always to provide against any loss on·her part through detention from accidental causes at the place of discharge, if such be the intention of the parties, by inserting in the bill of lading the time within which the cargo must be received, or by other familiar provisions, such as that the vessel shall ·have dispatch, or quick dispatch, either of which would cast the risk of delay upon the consignee."

In Evans v. Blair, 114 Fed. 616, 52 C. C. A. 396, Judge Putnam, after referring to the English decisions, said: ·

"The result of this class of cases, after some fluctuation, has been to leave the consignee a somewhat unlimited power in the matter of selecting the berth, regardless of its crowded state, provided only it is a safe one. This, however, comes from the fact that the charter party or bill of lading con-·tained express language favorable to the consignee, and from the application of ·the well-known rule that where, in maritime contracts, parties have seen fit to choose fixed forms of expression, the great variety of contingencies incidental to maritime transactions disenable the court from establishing any safe theory by which the latter can be modified to meet any supposed intent."

. In the view 'which we take of the terms of the charter party above discussed, we find it unnecessary to enter upon a consideration of the question whether or not the provision whereby were excepted "frosts," etc., "or any other hindrance of what nature soever beyond the' charterer's or their agent's control," under the facts of the case, of itself postponed the commencement of the lay days.

The decree is affirmed.