THE HANS MAERSK. AKTIESELSKABET DAMPSKIBSELSKABET AF
1912 v. 20,029 BAGS OF SUGAR (ARBUCKLE BROS., Claimant) et al.
SAME v. JAMISON et al.

(Circuit Court of Appeals, Second Circuit. June 25, 1920.)

Nos. 231, 232.

1. Shipping ⬥⇒177—Charterer's "default" in unloading covers all delays not
due to vis major or act of shipowner.
Where a charter party provided for demurrage for each day's deten-
tion by default of the charterer, the term "default" does not mean that the
charterer is liable only for delays due to his own fault, but renders him
liable for all delays in the performance of his covenant to unload, not
due to vis major or to the fault of the shipowner.
[Ed. Note.—For other definitions, see Words and Phrases, First and
Second Series, Default.]

2. Shipping ⬥⇒184—Burden is on charterer to prove delay in unloading was
due to shipowner.
The shipowner makes out a prima facie case for demurrage by proof of
delay, and the burden then lies on the charterer or consignee to prove
that the delay was due to the fault of the shipowner.

3. Shipping ⬥⇒180—Shipowner bound to employ enough stevedores to dis-
charge at charter rate.
A shipowner is bound to employ sufficient stevedores to deliver the
cargo at the vessel's rail at the rate specified by the charter, though it
would not be liable if it was prevented by strike or other cause beyond its
control from employing the stevedores.

4. Shipping ⬥⇒180—Delay in unloading held due to neglect of consignee to
furnish men to trim lighters.
Where the consignee neglected to send men to trim the lighters as sugar
was loaded on them, as a result of which some of the stevedores employed
by the ship had to do that work, so that the ship failed to deliver the
specified number of bags of sugar per day, the delay was due in part, at
least, to the fault of the consignee, rather than to shipowner's fault in
failing to employ sufficient stevedores, and it is liable for the demurrage
specified by the charter.

5. Shipping ⬥⇒174—Consignee, not charterer, held liable for delay in un-
loading.
Where the bill of lading provided for delivery of sugar to the consignee,
"on payment of steamship freight and all other charges, as per charter
party," the provision of the charter party for demurrage and the lien
therefor were incorporated in the bill of lading, and the consignee is liable
for the demurrage; the charterer having the benefit of the cesser clause
of the charter party.

6. Sales ⬥⇒201(4)—Title passes on delivery to carrier, when the contract re-
quires seller to ship and give credit for freight.
Where the contract merely required the seller to ship the sugar to the
buyer and to give credit for the freight, the buyer to procure the marine
insurance, the provision of Personal Property Law N. Y. § 100 (5), as
added by Laws N. Y. 1911, c. 571, as to the time title passes, does not
apply, but title passed to the buyer on shipment of the goods.

Appeals from the District Court of the United States for the South-
ern District of New York.

Libels by the Aktieselskabet Dampskibselskabet against 20,029 bags
of sugar, claimed in part by Arbuckle Bros. and against William A.

⬥⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Jamison and others, doing business under the firm name of Arbuckle Bros., by whom Jose Ignacio de Almagro and another were impleaded. Decree for respondents, and libelant appeals. Reversed, with directions to enter decree for libelant.

Haight, Sandford, Smith & Griffin, of New York City (Wharton Poor, of New York City, of counsel), for appellant.

Harrington, Bigham & Englar, of New York City (D. Roger Englar and Dix W. Noel, both of New York City, of counsel), for appellees Arbuckle Bros.

Kirlin, Woolsey, Campbell, Hickox & Keating, of New York City (John M. Woolsey, Forsyth Wickes, P. Randolph Harris, and Harold T. Hartwell, all of New York City, of counsel), for appellees Almagro & Co.

Before WARD, ROGERS, and MANTON, Circuit Judges.

WARD, Circuit Judge. August 8, 1917, Arbuckle & Co., of New York, entered into a contract there with Almagro & Co. of Havana, for the purchase of 6,000 bags of sugar to be shipped to New York the second half of August under a cost and freight contract; i. e., the sellers were to give credit in the price for the freight to New York. But the contract contained the express condition that the buyers were to cover the shipment by marine insurance from shore to shore, including risk of lighterage. Payment was to be made in New York at 10 days' sight draft for 95 per cent. of the invoice amount, with shipping documents attached; any balance to be paid after final settlement of weight and tests.

Almagro & Co. chartered the steamer Hans Maersk and loaded her with the sugar in question; the balance of the cargo being consigned to the Warner Sugar Refining Company. September 4, the sellers' 10-day sight draft for 95 per cent. of the net invoice amount of the sugar, together with the bills of lading, was presented to Arbuckle & Co., accepted by them, and paid before final discharge of the cargo. September 6 the steamer arrived, and first discharged the Warner Sugar Refining Company's cargo, and then Arbuckle & Co's. There seems to be no dispute that the cargo was not wholly discharged until four days beyond the lay days had been used.

Arbuckle & Co. repudiating any liability for demurrage, the shipowners proceeded in rem against 2,500 bags of their sugar, which was the last cargo discharged, and also in personam against them, and they brought in Almagro & Co. in each case under the Fifty-Ninth rule in admiralty (29 Sup. Ct. xlvi).

The material provisions of the charter party are:

"3,000 bags per working day are to be allowed to the said merchants (if the steamer is not sooner despatched) for loading the steamer and letting her wait for orders, to be reckoned from the day the captain reports and the steamer is ready to receive cargo (time employed in shifting port, not counting) until her day of dispatch, and from the time of her arrival at said port of call until receipt of orders, and to be discharged. * * * And that for each and every day's detention by default of said party of second part, or agent, * * * $1.200 U. S. currency per day, day by day, shall be paid by said party of the second part, or agent, to said party of the first part. * * *

The cargo or cargoes to be received and delivered alongside of the steamer, where she can load and discharge, always safely afloat, within reach of her tackles, and lighterage, and also extra lighterage, if any, at the risk and expense of cargo. Lay days for discharging to begin 24 hours after the vessel arrives and the captain has made entry in the customs house and is ready to deliver cargo. Vessel to be discharged at the rate of not less than 5,000 bags average per weather working day for discharging, Sundays, holidays, and Saturday's half holiday excepted. * * * Charterers' responsibility to cease when cargo is all on board and bills of lading signed, but master or owners to have an absolute lien on cargo for freight, dead freight, and demurrage."

Both cases were tried together and one decree entered. The trial judge dismissed the libels on the ground that the ship through her own fault was not able to deliver 5,000 bags a day. He said:

"If, from the time the lighters were ready, the sugar had come to the ship's rail at the rate of 5,000 bags per day, there were lay days enough then unconsumed to have fulfilled the charter obligation—all cargo would have been overside before demurrage time began. But the sugar did not come fast enough, though the lighters were ready and able to receive at charter rate. To be sure it required some one to trim, as the sugar bags came down on lighter deck, and the consignees hired men from the same stevedores as were discharging for the shipowner, to do this trimming. Whether this interfered with the supply of stevedores, or whether the same men both discharged and trimmed, is not very clear to me; but it is immaterial, for if the ship's stevedores neglected their duties to get trimmer's pay from consignees, it was the ship's business to call them to account. Net result was that discharge was not accomplished for some time after lay days expired, and the question here is: Was such overrunning of time due to any 'default' on the part of any one other than the ship herself? Until this question is settled the relations of charterer and consignee inter sese need not be considered.

"Libelant contends that, on showing the bald fact that discharge was not accomplished within the lay days, he has made out a prima facie case, and therefore, of course, that he has prima facie shown, under this charter, a default on the part of consignee or charterer or both. Without granting the correctness of this proposition, let it be admitted; but on the evidence I find the fact to be that either there were not enough stevedores on the ship, or they were not skillful enough, or the cargo was so stowed that no number of stevedores could get 5,000 bags a day through the available hatches, or rather hatch. * * * Thus it is plain that the delay—i. e., the 'default' of the charterer—occurred on the deck of the ship, and arose either from stowage or shortage of labor or tackle, and the query in this case becomes this: Was it the ship's duty (and not the charterers') to see to it that 5,000 bags per day were tendered to the consignee?

"This is to me so fundamental that it seems to need no discussion. Unless relieved by contract, it is the duty of every carrier by water to deliver his cargo at his ship's rail; his liability and duty as carrier extends to the end of his tackle. The only modification of that immemorial customary duty produced by this very common form of charter was to fix a quantum for daily delivery and receipt. This shipowner did not tender 5,000 bags a day, and this claimant was at all times ready, able, and willing to take that amount. Therefore the only default was by libelant."

[1] A charterer or consignee, if the bill of lading incorporates the demurrage clause, is bound by his agreement that a vessel shall be loaded or discharged within a given time, notwithstanding that the shipowner does the loading and discharging. The term "default," in the covenant to pay demurrage from day to day for every day's detention thereafter, does not mean that he is only liable to pay for delay due

to his own fault, but means delay caused by his failure to perform his covenant that the vessel shall be loaded or discharged in the time agreed upon. He takes the risk of all causes of delay, except those due to the fault of the shipowner and to vis major, which covers—

"a 'superior force, acting directly upon the discharge of the cargo;' 'a direct and immediate vis major;' an 'unusual and extraordinary interruption, that could not have been anticipated when the contract was made;' 'a sudden and unforeseen interruption or prevention of the act itself of loading or discharging, not occurring through the connivance or fault of the charterers,' and an 'interference on the part of an armed force, preventing the handling or moving of the cargo.' Upon principle, and according to the general current of authority, the detention alleged was not caused by default of the charterers, and did not render them responsible for demurrage, under this charter party." Crossman v. Burrill, 179 U. S. 113, 114, 21 Sup. Ct. 42, 43 (45 L. Ed. 106).

[2] The shipowner makes out a prima facie case when he has proved the delay, and the burden then lies upon the charterer or consignee to prove that the delay was due to the fault of the shipowner. There is no question of vis major involved here. The trial judge held that the delay was caused by the shipowner, because the stevedores employed by them were not able to deliver 5,000 bags a day at the end of the ship's tackles. This was due in part at least to the fault of the lighterman, who was the consignee's agent, in failing to equip the lighters with men to trim the cargo as it was received from the ship's tackles, which was a necessary element of receiving the cargo, and which caused the lighterman to employ stevedores who should have been working on the steamer's deck to work on the lighters in trimming cargo.

[3] It is a question open to some doubt whether for the purposes of the demurrage clause an insufficient number of stevedores or their incompetency is imputable to the shipowners. As the stevedores are performing the ship's duty of discharging the cargo, we think shipowners are as liable for their deficiency in number and skill as if the crew were discharging the cargo. Delay caused by a strike preventing the shipowners from getting stevedores at all would not be imputable to them, because it would be a matter beyond their control. Budgett & Co. v. Binnington & Co., 6 Asp. Mar. Cas. (N. S.) 592. But we think shipowners can fairly be expected to require the stevedores to employ enough competent men to discharge cargo at the required rate. We held the shipowner liable for the defaults of stevedores employed by him in Brooks v. Lumber Co., 229 Fed. 708, 144 C. C. A. 118. See, also, L. N. Dantzler Lumber Co. v. Churchill, 136 Fed. 560, 69 C. C. A. 270.

[4] On the other hand, the lighterman should have sent lighters equipped with men to trim the cargo as it was received from the ship's tackles. Without trimmers the lighters were as incapable of receiving 5,000 bags a day, as the shipowner was incapable of delivering them without a sufficient number of competent stevedores. Exactly what difference this shortage of equipment made does not appear, but on the whole case, especially in view of the fact that the consignee's lighters were not ready to receive at the rate of 5,000 bags a day, and took stevedores from the ship's deck, we think that the consignee has not

sustained the burden of proof. This requires us to consider other questions, which the opinion of the trial judge made it unnecessary for him to dispose of.

[5] The bill of lading for the particular bags proceeded against made the sugar deliverable to order of Almagro & Co., and was by them indorsed to Arbuckle & Co. It provided that the goods were deliverable upon payment "of steamship freight and charges and all other conditions as per charter party." This clause incorporated the provisions of the charter party as to demurrage, and, the shipowners having a lien for demurrage, the charterer is entitled to the benefit of the cesser clause. Russell v. Nieman, 17 C. B. (N. S.) 162; Crossman v. Burrill, supra; Carver on Carriage of Goods by Sea (6th Ed.) § 671. It follows that Almagro & Co. by virtue of the cesser clause are not liable under the charter party for demurrage incurred at the port of discharge, and that by virtue of the clause in the bill of lading Arbuckle & Co. personally and their sugar in rem are liable.

The libelant relies upon two decisions of this court. Milburn v. Federal Sugar Refining Co., 161 Fed. 717, 88 C. C. A. 577; Brooks v. Lumber Co., 229 Fed. 708, 144 C. C. A. 118. In the first case no lay days were provided for nor any agreement to pay demurrage. The obligation of the consignee was simply to receive the cargo in a reasonable time. In the second case there was doubt whether the delay of one-quarter of a day for rain ought to have been charged to the shipowners, but the charter party required that the charterer receive cargo if the vessel was ready to discharge in questionable weather, and there was nothing to show that she was so ready.

Arbuckle & Co. seek to hold Almagro & Co., brought in under the Fifty-Ninth rule, as owners of the sugar, under sections 100 (5) and 127 of the New York Personal Property Law (Consol. Laws, c. 41), as added by Laws 1911, c. 571, which read:

Sec. 127: "*Delivery to a Carrier on Behalf of the Buyers.* 1. Where in pursuance of a contract to sell or a sale, the seller is authorized or required to send the goods to the buyer, delivery of the goods to a carrier, whether named by the buyer or not, for the purpose of transmission to the buyer is deemed to be a delivery of the goods to the buyer, except in the cases provided for in section one hundred, rule five, or unless a contrary intent appears."

Section 100 (5): "If the contract to sell requires the seller to deliver the goods to the buyer, or at a particular place, or to pay the freight or cost of transportation to the buyer, or to a particular place, the property does not pass until the goods have been delivered to the buyer or reached the place agreed upon."

[6] Apart from the question whether a contract to sell 6,000 bags of sugar, not being maritime, is within the jurisdiction of the court, and from the consideration that a state statute cannot control a federal court sitting in admiralty (U. S. Rev. Stat. § 721 [Comp. St. § 1538]), we are of opinion that the exception in section 100 (5) does not apply. Of course, the sugar had to go to and be delivered at New York. The statement of these facts in the contract does not show that title did not pass until delivery. The contract of sale merely required Almagro & Co. to ship it there by steamer in the last half of August and to give credit for the freight. It was a c. and f. contract; that is, the freight

to New York was included in the price. Had insurance also been included, the contract would have been the ordinary c. i. f., which vests title in the purchaser when the seller has shipped the goods, secured the insurance and arranged to pay the freight. See the discussion of the question in Biddell Bros. v. E. Clemens Horst Co., [1911] 1 K. B. 934, [1912] App. Cas. 18; Thames & Mersey Marine Ins. Co. v. United States, 237 U. S. 19, 26, 35 Sup. Ct. 496, 59 L. Ed. 821, Ann. Cas. 1915D, 1087.

This particular contract differs from a c. i. f. sale only in requiring the seller to pay the freight. If it stopped there, and the New York Statute were applicable, section 100 (5) might control; but it went on to require the buyer to take out marine insurance. This is the only difference between it and a c. i. f. sale, and it seems to us immaterial. The controlling provision as to intention to pass title is the same in each case, viz. that the owner takes out the insurance to protect his own goods. This particular contract requires the buyers to take out the insurance, and so shows the intention of the parties to pass the title to them.

The decree is reversed, and the court below directed to enter a decree for demurrage in favor of the libelant and to dismiss both petitions under the Fifty-Ninth rule, with costs against Arbuckle & Co.