## UNITED STATES v. F. S. ROYSTER GUANO CO.

### THE LAKE YELVERTON.

(District Court, E. D. Virginia. · March 29, 1923.)

1. **Shipping** ⊝⇒181—**Charterer liable for demurrage for delay caused by vessel waiting its loading turn.**

> Where a charter party required the vessel to be delivered at designated port between· specified days, charterer to deliver cargo alongside and to load and discharge in five weather working days, or failing to do so to pay demurrage, lay days to commence from the time the captain reports ready to receive cargo, and loading was delayed because of limited port facilities requiring vessel to await its turn, the charterer was liable for demurrage, as it knew or should have known of the conditions and custom of loading at such port and contracted with reference thereto.

2. **Shipping** ⊝⇒181—**Commencement of lay days defined.**

> Under charter parties requiring the charterer to pay. demurrage after the expiration of the loading time agreed on and fixing lay days as commencing from the time the captain reports himself ready to receive or discharge cargo, the commencement of the lay days is at the expiration of such period after the service of notice of arrival by the master as the ship would require in the exercise of due diligence to haul to her wharf or pier, if the same were then provided.

In Admiralty. Libel by the United States, owner of the steamship Lake Yelverton, against the F. S. Royster Guano Company. Decree for libelant.

H. H. Rumble, Sp. Asst. in Admiralty to the U. S. Atty., of Norfolk, Va., for libelants.

Cadwallader J. Collins, of Norfolk, Va., for respondent.

GRONER, District Judge. The United States of America, as owners of the steamship Lake Yelverton, acting through an agent, entered. into a charter party with the F. S. Royster Guano Company, likewise acting through an agent, under date of September 14, 1920. By the terms of the charter party the owners agreed to deliver the vessel at Port Tampa, Fla., not earlier than September 15th and not later than September 25th, fit to receive and transport cargo. The charterer agreed to provide a full cargo of phosphate rock in bulk, to deliver the cargo alongside within reach of the steamer's tackle, and to load and discharge in five weather working days, inclusive, Sundays and legal holidays excepted, or, failing to do so, to pay the owners $1,000 per day demurrage. Lay days were to commence "from the time the captain reports himself ready to receive or discharge cargo." The steamer arrived at Port Tampa September 15th at 1 p. m., entered at the custom house, and at 2 p. m. of that day the master reported himself ready to receive cargo. His vessel as respects her physical condition was ready to receive cargo; she was then lying in the stream waiting to be assigned a berth. It is admitted by respondent, and stipulated as a fact, that, when the master of the steamer reported himself ready for cargo at 2 p. m. on September 15th, there was no

cargo in port for her; that this condition obtained likewise on the 16th and 17th, and until 9 p. m. of the 18th.

The contention of respondent is that it was excused from its obligation to furnish cargo by the fact that there were at Port Tampa no facilities for storing phosphate rock, that by the custom of the port vessels were loaded directly from cars as they came from the mine and in the order in which they arrived and registered for cargo, and that at the time when the master of the steamer reported her ready for cargo, at 2 p. m. September 15th, there were five other vessels ahead of the Lake Yelverton loading, or awaiting their turn to load, phosphate rock, and that all of the phosphate rock arriving in port between that time and 9 p. m. of September 18th was required for the loading of these vessels. The right to demurrage is denied by respondent on the ground that the master could not report his vessel ready for cargo when lying in the stream, but only after she had been placed in berth alongside the dock or wharf. Libelants, on the other hand, insist that under a charter party which required the vessel to proceed to a loading port, but does not designate the particular wharf or berth, but devolves that duty upon the charterer, the master may rightfully report himself ready to receive cargo when he has arrived at the designated port with his vessel, enters at the custom house and is ready, on orders from the charterer, to haul to a loading berth whenever so directed.

The question thus presented seems never to have been passed upon by the Supreme Court, nor in the Circuit Court of Appeals for this circuit. On the other hand, an examination of the cases in other Circuits discloses an almost hopeless conflict. The cases which hold that lay days do not commence until the ship is actually ready to begin to load or discharge either at the wharf or into or upon lighters, include the following:

In Aalholm v. Cargo of Iron Ore (Southern District of New York, 1885) 23 Fed. 621: There the charter party provided that lay days should commence from 6 o'clock of the morning after the vessel was ready to discharge. It was held that time should commence to run only from the time of the ship's actual readiness to begin the discharge, either upon the wharf or into lighters.

In Flood v. Crowell (C. C. A., Fifth Circuit, 1899) 92 Fed. 402, 34 C. C. A. 415, the provision of the charter party was that "the lay days should commence from the time the captain reports himself ready to receive or discharge cargo," and there, likewise, it was held that this means no more than that the lay days shall commence from the time the ship is ready to discharge cargo. It is true the decision as to liability under another clause turned upon the custom at the port of Galveston, which was the terminal point of the voyage, and where, by law, all the wharves are under the exclusive control of the harbor master, who directs the position and movement of all vessels.

From the same court, at a later date (1905), in the case of Lumber Company v. Churchill, 136 Fed. 560, 69 C. C. A. 270, substantially the same provision of a charter party was construed to mean that

the notice required to start the running of lay days was effective only from the time that the vessel was at her wharf ready to load.

Again, in Tweedie Trading Co. v. Lumber Co., 156 Fed. 88, also from the Southern District of New York (1907), a provision requiring the ship "to commence discharging immediately upon arrival" was construed to mean arrival at her berth or dock.

So, again, in Anderson v. Moore (C. C. A., Ninth Circuit, 1910) 179 Fed. 68, 102 C. C. A. 362, the charter party provided for lay days from the time that the vessel was "ready to discharge" on written notice by the master, and it was held that the notice to commence the running of the time could only be given after the vessel was in dock.

And in Niver Coal Co. v. Steamship Co. (1905), 142 Fed. 402, 73 C. C. A. 502, 5 L. R. A. (N. S.) 126, the Circuit Court of Appeals for the First Circuit construed a provision of a charter party providing that lay days should commence when the vessel is "ready to unload and discharge" and "written notice is given" to have no effect except from the time the vessel reaches the precise berth to which she may be ordered. See, also, Pyman S. S. Co. v. Railway Co., 169 Fed. 281, 94 C. C. A. 557.

A careful examination and review of the cases cited shows that in some of them, at least, the decision turned upon other questions, and again in others the authority upon which they are based fails to sustain the conclusion arrived at. Thus, in the Niver Case, supra, the cases cited as authority for the rule announced are Randall v. Sprague, 74 Fed. 247, 21 C. C. A. 334 and Donnell v. Manufacturing Co., 118 Fed. 10, 55 C. C. A. 178. In the Randall Case the charter party contained no fixed time for loading, and the court in that case held only that this imported a reasonable time, and that what was a reasonable time depended upon the custom of the port. In the Donnell Case a provision of the charter party similar to that in this case was stricken out before execution, and in lieu of the words so stricken out there was inserted in pen the following words:

"Vessel to report to the Consolidation Coal Company, Baltimore, for orders, it being understood vessel shall be loaded by them in turn."

This, of course, was no more than an agreement between the parties that the vessel should take its turn at the dock, whatever the delay, and that, this being done, no demurrage should be charged.

So, in Lumber Co. v. Churchill, supra, the decision is supported by a reference to MacLachlan on Merchant Shipping. An examination of the 1911 Edition of this work does not seem to me to support the conclusion drawn from it, but at page 589 the subject is discussed by the author at considerable length, and it is there stated that:

"Time begins, there being nothing to the contrary in the contract, when the ship has arrived at the place named in the charter party as her destination, provided that she is in fact ready to load or discharge, and also, as regards loading, that proper notice of her readiness has been given."

And the English cases cited in support of the text seem to hold that, where the place of loading named in the charter party is a port

or other wide district, the lay days begin when the ship is ready and placed at the disposal of the charterer within the commercial area of the named place, though she may not be in a position to take her cargo on board.

The American cases which follow the rule just above quoted begin, so far as I am able to determine, with Davis v. Wallace (Mass., 1868) 3 Cliff. 123–131, Fed. Cas. No. 3,657, in which Mr. Justice Clifford, sitting on the circuit, said:

"The settled rule is, where the contract of affreightment expressly stipulates that a given number of days shall be allowed for the discharge of the cargo, that such a limitation is an express stipulation that the vessel shall in no event be detained longer for that purpose, and that, if so detained, it shall be considered as the delay of the freighter, even where it is not occasioned by his fault, but was inevitable. * * * Where the contract is that the ship shall be unladen within a certain number of days, it is no defense to an action for demurrage that the over delay was occasioned by the crowded state of the docks, or by port regulations, or government restraints."

This case was reviewed by the Supreme Court in Crossman v. Burrill, 179 U. S. 100, 21 Sup. Ct. 38, 45 L. Ed. 106, and the inclusion of "government restraints" as one of the liabilities assumed by the charterer criticized, if not expressly overruled, but without apparent dissent as to the other conditions enumerated by the Circuit Court.

In the case of Carbon Slate Co. v. Ennis, 114 Fed. 260, 52 C. C. A. 146 the Circuit Court of Appeals for the Third Circuit (1902) had under consideration a charter party, which provided, "Lay days not to commence to count until 12 o'clock noon after the steamer is entered at custom house and in every respect ready to load," and held that:

"When the steamer had been entered and was ready to load, and the stipulated notice had been given, all had been done which she was required to do. It then became the duty of the shippers to promptly load her, subject only to the provision by which they were allowed till 12 o'clock noon thereafter for the commencement of lay days. The ship's readiness to receive the cargo 'from the charterers' shippers' was not dependent upon their readiness to assign her a berth. So long as this was not done, she was detained in waiting, not by any lack of readiness on her part, but by the unreadiness of the shippers, and therefore they, and not the master, were responsible for the consequent delay in loading her."

It was contended in that case, as it is in this, that the charterers were relieved by the fact that there was a custom of the port that each vessel should await its turn to obtain a wharf. In disposing of that contention Judge Dallas, speaking for the court, said:

"That fact could not relieve the charterers from their positive engagement as to the time at which the lay days would commence to count."

In The H. H. Chamberlaine, 214 Fed. 329, from the District Court of Massachusetts (1914), the provisions of the charter party were:

(a) "Lay days for loading and discharging shall be as follows: 'Commencing from the time the captain reports himself ready to receive or discharge;' and (b) 'customary dispatch and usual conditions at ports of loading and discharge.'"

The vessel was ordered to a particular dock; when she arrived at the dock it was occupied, and, according to the custom of the port, she would have succeeded to this dock when the other vessel

was unloaded, but as a result of the delay 10 days' additional time was consumed in unloading her. The court held that the libelant was entitled to demurrage for these 10 days.

In the case of Mott v. Frost, 47 Fed. 82, Judge Simonton, sitting in the District Court in South Carolina (1891), in construing a charter party providing that lay days for loading and discharging should commence from "the time the captain reports himself ready to receive or discharge cargo," held the charterer liable for demurrage on the vessel detained 2 days after notice because the only available berth was occupied by another vessel, regardless of the custom of the port allowing 24 hours after notice before commencing to receive cargo.

So, also, in the case of Bjorkquist v. Certain Steel Rail, etc., 3 Fed. 717, Judge Morris, in the District Court of Maryland (1880), held that, where a charter party stipulated that the cargo should be loaded and discharged "with all quick dispatch," the charterers were liable for demurrage where the vessel was, from the crowded condition of the port, delayed in procuring a berth.

In the case of Williams v. Theobold (District Court of California, 1883), 15 Fed. 465, notice was required to be given of the arrival of the vessel, and the cargo was to be unloaded as directed by the consignees at the average rate of not less than 100 tons per working day. There was a delay, due in part to an unusual and extraordinary number of vessels then in the harbor, and which were occupying all of the available wharves. It was held that this was no justification for the delay, and that the respondent was liable for demurrage at the agreed rate.

See, also, Empire Transportation Co. v. Iron Co. (C. C. A., Eighth Circuit) 77 Fed. 919, 23 C. C. A. 564, 35 L. R. A. 623; Moody v. 500,000 Laths (D. C.) 2 Fed. 607; Manson v. Railroad Co. (C. C.) 31 Fed. 297, which are generally in line with the doctrine announced in the preceding cases. See, also, to the same effect, MacLachlan on Merchant Shipping (5th Ed.) p. 579, and Scrutton on Charter Parties and Bills of Lading (8th Ed.) p. 304, where that author, in discussing the point, says:

"If by the terms of the charter the charterer has agreed to load or unload within a fixed period of time, that is an absolute and unconditional engagement, for the nonperformance of which he is answerable, whatever be the nature of the impediments which prevent him from performing it, unless such impediments are covered by exceptions in the charter, or arise from the fault of the shipowner or those for whom he is responsible. Thus, after the ship is ready to load or unload at the agreed place, the charterer will not, in the absence of express exceptions, be released from his contract by delay resulting from the crowded state of the docks, bad weather, or ice preventing loading, insufficient supply of cargo, lawful orders of the authorities at a foreign port, or strikes of persons for whom the shipowner is not responsible, even though the shipowner is prevented by the same cause from performing his share of the work."

Respondent, however, insists that, whatever may be the correct view as to the point discussed, it is nevertheless excused in this case by reason of the fourth clause of the charter party, which reads as follows:

"The act of God, restraint of princes and rulers, the steamer's enemies, fire and all and every other dangers and accidents of the seas, rivers and steam navigation of what nature and kind soever, and all and every other unavoidable hindrances which may prevent the loading and delivery during the said voyage, always mutually excepted,"

—and cites in support of this proposition the case the case of Crossman v. Burrill, supra, 179 U. S. 100, 21 Sup. Ct. 38, 45 L. Ed. 106. That was a case in which the vessel, with a cargo of lumber shipped from Pensacola, Fla., arrived at Rio de Janeiro, Brazil, in due time. The charter party provided for the discharge at port of destination at the average rate of not less than 20,000 superficial feet per running day, Sundays excepted, lay days to commence from the time the vessel was ready to receive or discharge cargo and written notice thereof given to the charterer, and for every day's detention by default of the charterer $59.46 demurrage should be paid. On the arrival of the vessel the notice of readiness to discharge was duly given, but the vessel was unable to discharge, notwithstanding due diligence on the part of the charterers, by reason of the acts of a public enemy; such acts consisting of the firing by ships of war at the forts in the harbor. This defense of vis major, the Supreme Court held, discharged the charterers from the obligations of the charter party, and that the detention thus caused was due to the acts of a public enemy and not by the fault of the charterer. The opinion characterizes the incident as "an unusual and extraordinary interruption that could not have been anticipated when the contract was made."

[1] In the case under consideration no condition of the sort mentioned above obtained. The charterer knew, or should have known, of the custom of loading at Port Tampa, of the fact that there were but two available piers and that both were under the control of the railroad, and presumably it contracted with reference thereto when it engaged to load and unload the vessel in five working days and to pay penalty for its failure so to do. If, by reason of conditions then obtaining at the port which it could not itself control, it was delayed beyond that time, the loss, it seems to me, should fall upon it, rather than upon the owners of the vessel; for the duty of providing the cargo and placing it alongside the vessel was an obligation which in terms it assumed, and which thereby became a condition precedent on its part in fulfillment of its contract. To shift this obligation to the owners of the vessel would be to make a new contract, and this, of course, there is no warrant in law for doing. While the exceptions noted on the charter party would, as in the Crossman Case, exonerate it from a claim for damages "occasioned by superior force acting directly" upon the loading of the vessel (Thacher v. Light Co., 2 Lowell, 361, Fed. Cas. No. 13,850), it is equally true that it would not discharge it from the indirect action caused by the crowded condition of the docks.

From this it follows that the only question remaining is the amount of demurrage for which respondent is liable. The penalty provided in the charter party was $1,000 per day. By stipulation of the par-

ties the actual time lost, counting from the moment of service of notice of readiness on the part of the vessel, was 14 hours and 20 minutes beyond the stipulated period of 5 days. This, obviously, was less than a day, and, since the contract is silent as to whether a fractional part of a day should count in ascertaining the penalty, it becomes necessary to decide that question, and, if it should be decided in the affirmative, to determine, also, whether it should be prorated on the basis of the penalty for an entire day, or whether the fraction of a day should be considered a whole day and the penalty allowed on that basis. No American authority has been furnished, and none has been found by the court. It is true that in Mott v. Frost, supra, Judge Simonton, in determining the amount of demurrage in a case in which the delay was for 2 days and a part of another, omitted the fraction of a day and allowed demurrage for only 2 days; and it is likewise true that in Lumber Co. v. Churchill, supra, Judge Pardee held that, where the notice was not received until the afternoon of the 18th, "the loading days did not commence against the charterers, under a fair construction of the charter party, until the next day."

[2] To follow the course adopted in either case is to leave the subject still indefinite and without fixed rule. It is desirable, it seems to me, that those who use this common form of charter party should have their respective rights and obligations so determined that the frequent disputes of the past may be avoided, and to this end it would be obviously fair, and in harmony with the terms of the contract, having due regard to the wide area of the ports of the country, the distances which ships are now required in some instances to anchor from the wharves or piers, and the time necessarily consumed in moving from one to the other, to fix the commencement of the time at such period after the service of notice of arrival by the master as the ship would require, in the exercise of due diligence, to haul to her wharf or pier, if the same were then provided. This would be to give effect to the purpose and intention of the parties in providing, for loading and discharging, a fixed number of days. It would place upon the charterer the obligation of providing the wharf and cargo upon arrival of the ship, or of paying demurrage if his failure to do so delayed the vessel beyond the stipulated time, and it would place upon the owner of the vessel the duty of placing the ship in position to load or discharge coincidently with the commencement of the lay days, and secure the charterer, whose obligation to provide facilities had been duly met, from loss, sometimes as much as an entire day, in moving a vessel from anchorage to pier.

Giving effect to this rule in the instant case, I think demurrage for half a day should be allowed, and a decree accordingly will be entered.