### UNITED STATES v. SUGARLAND INDUSTRIES.

(District Court, S. D. Texas, at Galveston.   May 26, 1922.)

#### Nos. 1126–1131.

1. **Shipping ⬉171—Bills of lading held to incorporate demurrage provisions of charter, so as to charge lien on cargo.**

   Bills of lading, two of which made the consignee or assigns liable for freight and demurrage as provided in the charter party, and the others of which stated freight and conditions were to be in accordance with the charter party, which took precedence of the bill of lading, were sufficient to embody the provisions of the charter party for demurrage into the bills of lading, so as to charge the cargo in the hands of the consignee with a lien for such demurrage.

2. **Shipping ⬉184—Evidence held to show vessel's equipment would permit discharge at charter rate.**

   Evidence on a libel for demurrage *held* to show that the vessel's equipment was sufficient, if manned with competent labor, to have discharged the vessel at the rate required by charter, and that the delay was due to the inefficiency of the labor employed.

3. **Shipping ⬉177—Vessel's capacity for discharging includes capacity of laborers it must furnish as well as of equipment.**

   Since the vessel is under obligations to furnish the labor for discharging the cargo, a provision in the charter party extending the lay days, if the vessel is unable to discharge at the rates provided, is not limited to cases where the vessel's equipment is insufficient to discharge at that rate, but includes cases where the laborers furnished by the vessel are not sufficiently efficient, because of general labor conditions at the port, to make the discharge at the required rate.

In Admiralty.   Separate libels by the United States, as owner of the steamship Lake Fairlie and five other steamships, against the Sugarland Industries to recover demurrage.   Decree rendered for respondent.

⬉For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

D. E. Simmons, U. S. Atty., and D. A. Simmons, Asst. U. S. Atty., both of Houston, Tex.

Williams & Neethe, of Galveston, Tex., for respondent.

HUTCHESON, District Judge.   These are consolidated cases, each of which was brought by libelant for demurrage on account of sugar cargoes consigned to respondent on the respective steamships Lake Fairlie, Lake Foxcroft, Lake Superior, Lake Fairlin, Lake Folcroft, and Lake Dancey.   The charter parties which are relied on for recovery provided when lay days for discharging should begin, for allowance for delay under proper circumstances, and further provided:

"Vessel shall be discharged at the rate of not less than seven thousand five hundred (7,500) bags of 325 lbs. each or equivalent, per working lay day.

"Lay days are not reversible.

"Demurrage in loading and discharging, except as provided below, shall be payable by the charterer or his agent day by day, on the basis of forty-eight (48) cents United States currency per gross registered tonnage of vessel per day.

"If vessel is unable to load or discharge at the rates provided, lay days shall be computed on the basis of the vessel's capacity for loading or discharging.

"In calculating demurrage, a fraction of a day, if demurrage is incurred, shall be computed on the basis of a 24-hour day.

"Bills of lading on approved form shall be signed without prejudice to this charter, and subject to this contract as to freight, dead freight, and all other conditions, including loading, discharging, demurrage, and dispatch.

"Vessels shall have an absolute lien on cargo for freight, dead freight, and demurrage, both loading and discharging."

The bill of lading in the Lake Fairlie provided that—

"The shipper, consignee, and/or assigns shall be liable for freight, demurrage, etc., as provided in the charter party."

And the same provision appeared in the bill of lading on the Lake Foxcroft.   The bills of lading on the other ships did not contain the provision above referred to, but each contained in substance this clause:

"Freight and all conditions and exceptions to be in accordance with the charter party covering this cargo, and said charter party to take precedence of this bill of lading."

None of the cargoes were discharged at the rate of 7,500 bags per day, and the government brings this suit to recover demurrage for the time consumed in discharging over and above the number of days in which the vessel would have been discharged, had she discharged at the rate of 7,500 bags a day.

The defense of the respondent is: First, that except as to the Lake Fairlie and the Lake Foxcroft, the bills of lading contained no reference to demurrage, and that the consignee cannot, therefore, even if it did accrue, be held liable for the same; second, that irrespective of this contention, they are not liable, because the vessel was unable to discharge at the rate provided, and computing the lay days on the basis of actual capacity, there was no delay, and that, if the capacity of the boats was 7,500 bags per day, the fault in not discharging at that rate was the shipowners, upon whom by the charter the duty of unloading was imposed.

To these contentions the government replies, first, that all of the bills of lading incorporate the charter parties in them by reference sufficiently to charge the consignee with notice of the lien by the said charter party retained on the goods and to establish the consignee's liability for such demurrage as actually occurred; second, that the only relief from the obligatory discharge rate of 7,500 bags was the vessel's incapacity to discharge at that rate; and, third, that the evidence affirmatively shows that the vessel could discharge at that rate, and would have done so, but for the bad practice employed of having the same stevedore unload for the ship and receive for the consignee, coupled with the inefficiency of the labor at that time employed in the port of Galveston.

[1] Adverting to these considerations in order, I think it clear that the first contention of the government is sound, and that the provisions of the charter party fixing a lien on the freight were embodied in and became a part of the bill of lading, so that the consignee was charged with knowledge thereof, and responsibility therefor, and that for whatever demurrage properly accrued the government has its action against the respondent. The Hans Maersk (C. C. A.) 266 Fed. 809.

[2] As to the other contentions of the government far greater difficulty arises. In the first place, I am inclined to be of the opinion that the evidence fails to establish that the actual discharge capacity of the vessel was 7,500 bags per day. The most that can be said of the evidence is that this lake type of craft with four hatches, with a cargo of 20,000 to 25,000 bags, could for the first day be discharged under pressure and with very efficient crews, at the stipulated rate, while all of the evidence established that some of the hatches were unloaded more readily than others, and that, as the discharge proceeded, the capacity for discharge decreased. So that there is no evidence that even under high pressure the rate of 7,500 bags per day could be maintained throughout the entire period of discharge. The evidence further showed that, even when the hatches were all full, a discharge rate of between 6,000 and 6,800 bags was considered very good at that time, on account of the inefficient labor.

The government concedes that, if the court finds the actual discharge capacity was less than 7,500 bags per day, and that, figuring upon the actual capacity of the vessel, there was no delay, its suit must fail; but they assert that, if they can maintain the point that the actual capacity of the vessel for discharging was such as to show that more lay days were consumed than ought to have been at the 7,500-bag rate, then it does not lie in the mouth of the consignee to seek exemption from demurrage, on account of the fact, which was admitted by all, that labor at that time was inefficient, and the shipowners were unable to effect the discharge, not because of the physical incapacity of the boat through want of equipment, but because of the inefficiency of the crews.

As to the physical capacity of the boats, the Sugarland Industries point to the fact that since that time the stipulated discharging rate for that same type of boat has been reduced from 7,500 to 6,000 bags per day, while the government, on the other hand, produces evidence

281 F.—16

that since that time, with the present efficiency of labor, the same type of boat has discharged as much as 8,500 bags per day.

There was also evidence that on one day, at the very time in question, a stevedore did discharge more than 7,500 bags; but there was also evidence that at the end of that day he gave up the job. There was evidence that, when at the request of the Shipping Board's agent the vessel undertook to discharge by depositing the bags on the wharf, the rate of discharge was greatly in excess of 7,500 bags a day; but this experiment proves nothing, as that character of delivery is not a good delivery. Many stevedores engaged in the business of handling ships at Galveston testified that the method employed of having one stevedore discharge for the ship and receive for the consignee was a better, more economical, and swifter method, and all of them agreed that an average of 6,000 to 6,500 bags a day was very good at the time in question.

[3] In the light of all the evidence, it is difficult for the court to declare that the vessel did not have the tackle, appliances, and arrangements for discharging 7,500 bags per day had labor conditions justified it, and it does not so hold; but it is held that the government cannot recover for demurrage, both because the clause in the charter party, "If the vessel is unable to load or discharge at the rates provided, lay days shall be computed on the basis of the vessel's for loading or discharging," means capacity, not with reference to its physical equipment, but with reference to its physical equipment as actually used by the labor it furnishes, and because, if the charter party should be differently construed, it is plain under the evidence that the duty to discharge rested upon the shipowner, and that the failure to discharge was due to the fault of the shipowners' employees, and not to the fault of the charterers.

The law in this case is well stated in Brooks v. Hilton Dodge Lumber Co., 229 Fed. 708, 144 C. C. A. 118, and is directly opposite to the contention of the government that they are not responsible for the inefficiency of their own labor. In that case it is said:

"The common expression that so many days are allowed for loading and discharging a vessel is misleading. There is no obligation on the vessel to load or discharge within any fixed time. The duty is that of the charterers to furnish and receive the cargo, if the vessel be able to load and discharge it within a fixed period, viz. the lay days. For any delay caused by the vessel the lay days would be pro tanto extended, and any delays due to the charterer would of course be included in the lay days."

The court in that case held that the duty of unloading the vessel was the duty of the ship, and not of the charterer, and that for any delay in unloading the ship is responsible, even though the delay was due to the action of the stevedores, and by the charter the selection of the stevedore was subject to the approval of the charterers.

Again, in The Hans Maersk (C. C. A.) 266 Fed. 809, cited and relied upon by the government, the court said:

"It is a question open to some doubt whether, for the purposes of the demurrage clause, an insufficient number of stevedores or their incompetency is imputable to the shipowners. As the stevedores are performing the ship's duty of discharging the cargo, we think shipowners are as liable for their de-

ficiency in number and skill as if the crew were discharging the cargo. Delay caused by a strike preventing the shipowners from getting stevedores at all would not be imputable to them, because it would be a matter beyond their control. ❊ ❊ ❊ But we think shipowners can fairly be expected to require the stevedores to employ enough competent men to discharge cargo at the required rate. We held the shipowner liable for the defaults of stevedores employed by him in Brooks v. Lumber Co., 229 Fed. 708, 144 C. C. A. 118. See also, Dantzler Lbr. Co. v. Churchill, 136 Fed. 560, 69 C. C. A. 270."

And to the same effect is the holding of the Circuit Court of Appeals for the Fifth Circuit in West Hartlepool v. Va.-Carolina Chemical Co., 164 Fed. 836, 90 C. C. A. 288.

In the light of these authorities it is clear that no responsibility rests here upon the consignee in the matter of demurrage, and that the government's libel must fail; and it will be so ordered.